[No. 4850.]

THE PEOPLE EX REL. THE ATTORNEY GENERAL v. JOHNSON.

1. **Constitutional Limitation—Amendment—Exemption of Territory from Provisions of Constitution—Municipal Matters.**

    The people cannot by amendment to the constitution free any portion of the state from the operation of any part of the constitution, nor vest in the citizens of any portion of the state power to legislate upon matters other than those purely local and municipal.

2. **Same—City and County of Denver—Authority of Charter Convention.**

    Under article XX of the constitution the charter convention of the city and county of Denver in its authority to legislate is limited to matters purely local and municipal in their character. It has no authority to legislate upon any subject whatever in contravention of any provision of the constitution relative to governmental or state matters or to county or state offices and officers.

3. **Same—County Judges.**

    The provisions of the charter of the city and county of Denver, adopted March 29, 1904, increasing the number of judges of the county court to two and changing the time of elec-

| 34 | 143 |
| f34 | 195 |
| f34 | 196 |
| f34 | 197 |
| f34 | 198 |
| f34 | 199 |
| f34 | 200 |
| f34 | 201 |
| f34 | 204 |
| f34 | 205 |
| f34 | 308 |
| f34 | 321 |
| 34 | 143 |
| 38 | 42 |
| 38 | 47 |
| 38 | 380 |
| 83 | 381 |
| 38 | 388 |
| f38 | 502 |
| 38 | 503 |
| 38 | 504 |
| 38 | 509 |

tion of such judges are invalid and inoperative, and one elected to fill the additional office provided for by said charter is not entitled to hold and exercise the office of county judge of the city and county of Denver.

### Original Proceedings in Quo Warranto.

Mr. N. C. MILLER, attorney general, and Mr. H. J. HERSEY, for relator; Mr. J. C. STARKWEATHER *amicus curiae.*

Mr. STERLING B. TONEY, Mr. CHARLES R. BROCK, Mr. MILTON SMITH, Mr. CLAY B. WHITFORD, Mr. HARVEY RIDDELL, Mr. SAMUEL W. BELFORD and Mr. GEORGE F. DUNKLEE, for respondent.

Mr. JUSTICE MAXWELL delivered the opinion of the court.

The information in *quo warranto* filed by leave of court by the people of the state of Colorado on the relation of N. C. Miller, the attorney general of the state, charged that one Henry V. Johnson, a citizen of said state and a resident and qualified elector of the city and county of Denver therein, did on, to wit: the 1st day of June, 1904, without any warrant or authority of law usurp and intrude himself into the office of county judge of the city and county of Denver and ever since has continued and still does continue to unlawfully usurp and intrude himself into said office of county judge of the city and county of Denver; that he, the said Henry V. Johnson, is now unlawfully holding a regular term of the county court of said city and county of Denver, and is still usurping and intruding into and unlawfully holding and exercising the functions of judge of the county court in said city and county of Denver, and called upon him to answer by what warrant he claims to hold such office or exercise the powers,

perform the duties and receive the fees and emoluments thereof, and that he be ousted and excluded therefrom.

In response to a rule to show cause, duly served, respondent filed his answer and return, wherefrom it appears in substance that he is a duly qualified elector in and for the city and county of Denver and in every way qualified to hold the office of county judge of said city and county; that under and by virtue of article XX of the constitution of the state of Colorado, pursuant to an election ordered by ordinance of the city council of Denver, a special election was held at which members of a charter convention were elected, which charter convention framed a charter for the city and county of Denver in harmony with said article XX of the constitution; that on the 29th of March, 1904, said charter so framed by said charter convention was submitted to the qualified electors of the city and county of Denver, and by such qualified electors was approved and became and was and is the charter of said city and county of Denver; that in and by said charter it was provided that the county court of the city and county of Denver should consist of two judges; that at the next city and county election two judges should be elected, one of whom should be for the short term; that the judge elected for the short term should within thirty days after his election qualify and enter upon the duties of his office and should hold such office until the second Monday of January, 1907; that the judge elected for the long term should enter upon the duties of his office on the second Tuesday of January, 1905, and hold office for a term of four years; that the judges of the county court should be elected, one every two years, each for a term of four years; that such judges should be elected at the same time and manner as other officers of the city and county of Denver at the general city.

and county election next preceding the expiration of their respective terms of office; that in case of vacancy occurring from any cause the mayor by and with the consent of the board of supervisors should appoint a person possessing the qualifications herein provided for county judges, to act as such judge until his successor is duly elected and qualified; that said charter provided that a general city and county election should be held on the third Tuesday in May, being the 17th of May, 1904, and every two years thereafter; that at the first city and county election there should be elected a mayor, auditor, assessor, treasurer, clerk, recorder, coroner, county superintendent of schools, 2 judges of the county court, 16 aldermen, 7 supervisors, 3 justices of the peace, 3 constables; that the terms of all elective officers shall commence on the first secular day of June following their election, and shall be four years and until their successors are elected and qualified; that at the election held May 17, 1904, respondent was elected to the office of county judge, and within thirty days after such election qualified and entered upon the duties of said office of county judge, and is now holding said office and discharging the duties thereof pursuant to such election; denies that he did usurp and intrude himself into the office of county judge of the city and county of Denver and avers that he holds the same and discharges the duties of said office under full warrant and authority of law and by virtue of his election as hereinbefore stated.

To this answer and return the people filed a general demurrer, whereby the constitutionality of the charter provisions relied upon by the respondent is brought directly in issue.

This is one of eight cases now pending in this court of like character involving the title to the following county offices in the city and county of Denver,

to wit: county judge, county assessor, county clerk and ex officio recorder, treasurer, constable, sheriff, county commissioners and justices of the peace.

All of these cases were argued orally and submitted at the same time, and all involve substantially the same questions except that this case involves the further question whether the charter convention was authorized to increase the number of county judges to two.

In the consideration which the court has given these cases all of the briefs and arguments filed by counsel in all of the cases and all authorities cited have been thoroughly and exhaustively considered by the court.

Respondents in these cases are represented by an array of eminent counsel all of whom have filed elaborate, exhaustive and learned briefs and arguments, covering every conceivable phase of every question which might be presented to the consideration of the court. In a multitude of counsel there is wisdom and necessarily a difference of opinion upon matters under consideration. If it should transpire that this opinion attempts to set forth the views of counsel as presented in the briefs and arguments filed, as we understand them, which do not coincide with the views of counsel reading the opinion, let not the opinion be criticised upon this account alone until at least the reader has carefully read and analyzed the 1,500 pages of briefs and arguments filed.

It is the contention of the relator that the charter convention of the city and county of Denver provided for by article XX cannot legislate in any particular as to the county court or the county judge or any other office, officer or matter not of purely local or municipal concern; that the constitution provides for one county judge in each county of the state and

requires that all laws relating to courts shall be general and of uniform operation throughout the state, and that the organization, jurisdiction, powers, proceedings and practice of all the courts of the same class or grade so far as regulated by law shall be uniform (Constitution, secs. 22, 28, art. VI); that the charter provisions assuming to increase the number of county judges of the city and county of Denver, to change the time of election of the county judge and time of the beginning and ending of his term, and to legislate in any particular as to the county judge of the county court are unconstitutional and void; that there is nothing in article XX of the constitution which shows an intention to change the scheme of government in this particular, and if there were, it would be unconstitutional, and that there is nothing in article XX which shows any intention to grant any power to the charter convention to supersede the provisions of the constitution or general statutes relating to the county or the state government, and therefore if the charter convention has legislated or attempted to legislate upon any matter which supersedes the provisions of the constitution or general statutes such legislation is unconstitutional and void.

In our opinion the contention of relator is fully sustained by the majority opinion of the court in *People v. Sours,* 31 Colo. 369, and in the opinion of the present chief justice specially concurring.

At page 385 Mr. Justice Steele in delivering the majority opinion says:

"Counsel say: 'Had it been the intention that the constitution and laws should be in force in this territory, this instrument would have so stated. The language of the above provisions is plain and unambiguous. It has been said that in construing a constitutional provision it will be presumed that every

word was weighed and its meaning carefully considered before its insertion in the instrument; and this instrument says that the city and county of Denver can adopt any measure and shall always have the exclusive power to make, alter and revise their charter. That means everything. If not, why not? This charter is to be the organic law. A legislative act is now the charter of the city of Denver, and the constitution of this state and the laws thereof constitute the organic law of this county. But this instrument changes all this and says that the charter as framed by the charter convention shall not only be the charter of the city and county but shall be the organic law thereof. That language means something. It displaces and was intended to displace the constitution, the laws and the general assembly.'

"If this amendment must be given that construction, it cannot be sustained. Even by constitutional amendment the people cannot set apart any portion of the state in such manner that that portion of the state shall be freed from the constitution, or delegate the making of constitutional amendments concerning it to a charter convention, or give to such charter convention the power to prescribe the jurisdiction and duties of public officers with respect to state government as distinguished from municipal or city government. The duties of judges of the district court, county judges, district attorneys, justices of the peace and generally of county officers are mainly governmental; and so far as they are governmental they may not be controlled by other than state agencies without undermining the very foundation of our government. Under the constitution of the United States the state government must be preserved throughout the entire state; and it can be so preserved only by having within every political subdivision of the state such officers as may

be necessary to perform the duties assumed by the state government under the general laws as they now exist or as they may hereafter exist.

"This distinction between the governmental duties of public officers and their municipal duties is fundamental and therefore is not avoided or affected by the consolidation.

" 'Counties, townships, school districts and road districts do not usually possess corporate powers under special charters; but they exist under general laws of the state which apportion the territory of the state into political divisions for convenience of government and require of the people residing within those divisions the performance of certain public duties as a part of the machinery of the state; and in order that they may be able to perform those duties vest them with certain corporate powers. Whether they shall assume those duties or exercise those powers the people of the political divisions are not allowed the privilege of choice; the legislature assumes this division of the state to be essential in republican government and the duties are imposed as a part of the proper and necessary burden which the citizens must bear in maintaining and perpetuating constitutional liberty.'—Cooley's Constitutional Limitations, *240.

" '*A municipal corporation proper* is created mainly for the interest, advantage and convenience of the locality and its people; a county organization is created almost exclusively with a view to the policy of the state at large, for the purposes of political organization and civil administration in matters of finance, of education, of provision for the poor, of military organization, of the means of travel and transport, and especially for the general administration of justice. With scarcely an exception all the powers and functions of the county organization have

a direct and exclusive reference to the general policy
of the state and are in fact but a branch of the general
administration of that policy.'—1 Dillon's Municipal
Corporations, § 23.

"The respondent's construction, however, is not
that placed upon the amendment by the counsel for
the petitioners, or, we assume, by the people.  The
provision that 'Every charter shall designate the
officers who shall respectively perform the acts and
duties required of county officers to be done by the
constitution or by the general law so far as appli-
cable' completely contradicts the assumption that the
amendment regards such duties as being subject to
local regulation and control.  The amendment is to
be considered as a whole in view of its expressed
purpose of securing to the people of Denver absolute
freedom from legislative interference in matters of
local concern; and so considered and interpreted, we
find nothing in it subversive of the state government
or repugnant to the constitution of the United
States."

At page 410 Mr. Justice Gabbert says:

"  *  *  *  the whole scope and purpose of the
amendment was to provide home rule for certain
cities with respect to certain governmental matters
local in their nature.  This is apparent from the
contents of the amendment itself as well as the pro-
visions designating what should appear upon the
official ballot in order to enable the electors to vote
for or against its adoption.  Its several provisions
all relate to this one general object and are designed
to accomplish this one purpose in so far as they relate
to cities designated in the amendment either by name
or class."

And in this connection, the following language of
Mr. Justice Gabbert is significant (page 411) : "What
particular subjects, however, relating to govern-

mental affairs are embraced in the amendment is a
matter for the convention assembled to form a charter
to most carefully consider.  It should also be borne
in mind that there may be provisions of the constitu-
tion other than article 20 which must be observed in
the creation of a charter.''

The foregoing construction of article XX was in-
terpreted and approved by the unanimous opinion of
this court in *Parsons v. People,* 32 Colo. 221, 76 Pac.
672, where Mr. Justice Campbell said: ''Neither is
this revenue act of 1902 in violation of any provision
of article XX.  In the majority opinion of this
court, in *People v. Sours,* 31 Colo. 369, 74 Pac. 167,
it was clearly indicated that the general scheme of
government therein contemplated is restricted to that
of the municipality proper, and does not intrench
upon county or state government.  It does not pur-
port to nullify the constitution or general laws of the
state in so far as they pertain to county or state gov-
ernment or attempt to interfere with the power of
the state in raising state revenue.''

The above quoted language from the majority
opinion in the Sours case was used in disposing of
the ''second objection'' urged by counsel for respond-
ent in their argument that article XX was inoperative
and void.  This objection as stated on page 383 of
the opinion is as follows:  ''2.  It violates the pro-
vision of section 4 of the enabling act providing that
the constitution shall be republican in form  *  *  *
and not be repugnant to the constitution of the United
States and the principles of the Declaration of Inde-
pendence.''

The ''above provisions'' referred to in the opin-
ion as stated by counsel are:

''Sec. 2.  The officers of the city and county of
Denver shall be such as by appointment or election
may be provided for by the charter; and the juris-

diction, term of office, duties and qualifications of all such officers shall be such as in the charter may be provided."

"Sec. 4. The people of the city and county of Denver are hereby vested with and they shall always have the exclusive power in the making, revising or amending their charter."

And further on: "Whereupon it shall become the charter of the city and county of Denver and shall become the organic law thereof."

"Sec. 5. The citizens of the city and county of Denver shall have the exclusive power to amend their charter or to adopt a new charter, or to adopt any measure as herein provided."

Thus it is seen the precise question here involved was ruled by the majority opinion in the Sours case.

We might without further discussion conclude this opinion at this point basing our conclusions upon the ground that the question here presented under the authorities above cited is not an open one but is and must be held to be *stare decisis*.

The ability, learning and force with which counsel representing respondent present their views lead us to state their position, the argument in support thereof, and to point out what we ·deem to be the fallacy of both position and argument.

In the first place, counsel concede that the county judge and other county officers down to and including constable are state officers in that they derive their existence and powers from the constitution and general laws and perform state and gevernmental functions.

The position taken by respondent is, the charter having designated "the officers who shall respectively perform the acts and duties required of county officers to be done by the constitution or by general law," notwithstanding the fact that the county judge and

other county officers are constitutional officers per-
forming state and governmental functions, and not-
withstanding the fact that the powers, jurisdiction
and procedure of the county court are prescribed by
the constitution and general laws beyond the interfer-
ence of the charter, the *agencies* for the performance
of such acts and duties having been designated by
the charter, the constitution is complied with and a
republican form of government preserved.

In other words, so long as the charter designates
some one who shall perform the acts and duties of
county judge and other county officers, respondent
contends that the charter convention can do what it
pleases with the county court and other county officers.
It may abolish them, it may increase the number of
incumbents, it may increase the term of office indefi-
nitely, it may change the time of election or abolish
elections entirely, making the office appointive, it may
vest the appointing power in one man or any number
of men, or it may qualify and designate one man to
perform the acts and duties of all county officers.

Referring now to the construction placed by this
court on article XX, the learned justice who wrote
the majority opinion in the Sours case used this
language: "If this amendment must be given *that
construction,* it cannot be sustained."

What construction? Unquestionably the con-
struction contended for by counsel who were seeking
to establish the invalidity of the amendment, the con-
struction stated in the quotation immediately pre-
ceding and which called forth the declaration above
quoted. The construction contended for here—a con-
struction which, as expressed by counsel for respond-
ent herein, would "cut loose the city and county of
Denver from any and all constitutional limitations
and restrictions and make the voice of the people,

whether deliberately or hysterically expressed, the law in that locality.''

In the Sours case the court repudiated such construction and upheld the validity of the amendment, saying: ''The amendment is to be considered as a whole in view of its expressed purpose of securing to the people of Denver absolute freedom from legislative interference in matters of *local concern;* and so considered and interpreted we find nothing in it subversive of the state government or repugnant to the constitution of the United States.''

If the majority of the court in the Sours case had been of the opinion that article XX had for its purpose the securing to the people of Denver absolute freedom from legislative interference *in all matters* relating to county and state governmental offices, officers and functions, the inevitable conclusion would have followed that the amendment would have been held subversive of a republican form of government and repugnant to the constitution of the United States.

The charter adopted March 29, 1904, increases the number of county judges to two, changes the time of election, changes the time when the term of office shall begin, provides that the qualifications of county judges shall be the same as district judges; that in case of vacancy the mayor, with the consent of the board of supervisors, shall appoint; changes the salary and manner of payment; and in addition to the above, confers upon the county court jurisdiction in some matters unnecessary to consider, all of which provisions are contrary to article VI of the constitution as amended.

The same rule of construction applied by this court to article XX must be applied to the charter framed under that article.

This court having held that article XX could not be sustained if it purported to cut loose the city and county of Denver from any and all constitutional or legislative limitations and restrictions, it must follow that a charter framed thereunder, in so far as it purports to accomplish the same thing, cannot be maintained. Again, referring to the majority opinion in the Sours case:

"Even by constitutional amendment the people cannot set apart any portion of the state in such manner that that portion of the state shall be freed from the constitution."

In what respect "freed from the constitution?" To what extent "freed from the constitution?" May the people of any portion of the state be freed from any article or any section of any article of the constitution? If yea, where and when must the freeing process cease?

In *Ames v. People,* 26 Colo. 83, 109, this court has said: "The test of the constitutionality of a statute is not what has been done, but what by its authority may be done."

To concede that article XX authorizes a charter convention to legislate upon *any subject whatever,* in contravention of *any* of the provisions of the constitution relative to governmental or state matters or to county or state offices and officers, is to concede that such convention might displace the constitution in every respect, and the charter, being the organic law of the city and county, would thereby become supreme within the territory included in the boundaries of the city and county; hence we would have a portion of the state freed from the constitution—over which the state had no right to legislate—which could have no interest whatever in any legislation which might be enacted by the state relating to state and governmental affairs. In short, an *imperium in*

*imperio,* a condition which cannot be brought about or exist even by constitutional amendment, as emphatically decided by the majority opinion in the Sours case.

This is not a question of whether a *mere change* in the *term* of office and *time* of election of an officer performing governmental duties is an act subversive of a republican form of government. The question is, can the people of the state, by constitutional amendment, set apart any portion of the state and vest the citizens thereof with power to legislate upon matters other than those purely local and strictly municipal in their character?

In the Sours case this court has said that this could not be done for the reason that such act would be subversive of a republican form of government, repugnant to the constitution of the United States and violative of the compact existing between the state and federal government.

If such plenary power to legislate cannot be granted, a single act of legislation would be invalid, even though it be legislation changing the term of office, and the time of election of county officers performing state and governmental functions.

To concede the right to legislate upon such matters in the slightest particular must be to concede the right to legislate on all matters, and we would have a community of citizens representing one-third of the population of the state legislating for themselves upon all matters, and not subject to the general legislation of the state.

Such a condition is the logical result of permitting the first act of inhibited legislation.

If the people of Denver by article XX are authorized, through a charter convention, to change the term of office, time of election and number of incumbents of one state or county governmental office, they are

authorized to change all of them, and in any respect
they may see fit. The tenure of office might be made
for life with power to name a successor, in which
event there would be no election. Ten county judges
instead of one might be appointed, or the office might
be abolished, and the mayor, the sheriff or any other
officer designated to perform the duties of county
judge, or one person might be designated to perform
all the duties of all county officers.

Confining the powers of the charter convention
to legislate upon matters purely local and municipal
in character, as was done by the court in the Sours
case, avoids the contingency above outlined.

In a case pending in this court in which respond-
ent herein is named as respondent, wherein was
involved the right of the county court of the city and
county of Denver to hear an election contest of the
office of mayor, counsel appearing for respondent
here appear therein in the same capacity, and have
filed a brief, portions of which are instructive and
interesting, as to the views of counsel at the time that
brief was prepared.

"And in the exercise of such special powers as
were conferred upon the body politic therein contem-
plated and mentioned, it was clearly the intent of the
article [20] that the general laws and constitution of
the state were to be followed. The mere grant of a
special power does not carry with it any authority
to exercise it in a manner not contemplated by law.
The affairs of the city of Denver had for years been
a favorite subject of legislation by the general as-
sembly of the state. The people of Denver were
governed by the state even in matters peculiarly of
local concern and pertaining to the conduct of the
municipality. In such affairs the legislature was
the continuous and sole arbiter of our municipal for-
tunes, and to remedy this evil the article in question

was submitted and adopted. When its purpose is considered, it will be found helpful in ascertaining the extent to which the article was carried. *Home rule had a well defined meaning. It meant that as to all the affairs of the city and county of Denver which affected the relations of the citizens with their local government they should be freed from state interference, regulation or control; that the system of public improvements, the building of streets or alleys, the appointment of officials, the designation of their duties and how they should be performed, and all other matters purely of local interest, advantage and convenience should be left* to the people of Denver for their own determination. This did not in any wise relieve them from the operation of the general law or constitution of the state, nor was it desired that such a condition should exist. The laws of the state and its constitution were as much in force after the adoption of the 20th article as before. All public and governmental duties which the people of the new body politic or the corporation itself were to perform were still binding upon them. The policy of the state government or of the people in reference to the state government was still to be fixed and determined by general law equally in force, effect and operation in every part of the state. *The 20th article did not set apart a territorial subdivision of the state, where people were to be freed from the general laws binding upon all other portions of the state. It did not attempt to set up a new government which was independent of the lawmaking department of the state and invested with authority to govern itself as it might see fit.* It had no power to inaugurate or establish a revenue or *judicial system* of its own without regard to other portions of the state. Whatever public laws the general assembly might see fit to enact were to apply here as elsewhere, and to affect the

citizens of Denver as they did the citizens of other communities and in the same manner. This was not to be a state within a state, but a republican form of government was to exist throughout the entire state. The purpose of the amendment was to give us freedom in local municipal matters, but not to relieve us from the general laws or other portions of the constitution in public affairs or governmental matters. We *were free to act in matters of local concern, not in matters of public governmental or state concern. Home rule for cities means home rule in strictly city affairs.* While we were given special powers not enjoyed by all other portions of the state, these powers so conferred were of a nature that could not affect us as a part of the state. *We were to enjoy self-government in all relations purely local and municipal which did not bring us into contact with the state at large or its political and territorial subdivisions as such.* All general systems of state policy were still in force here and unaffected by the 20th article of the constitution. Where that instrument had provided the manner in which governmental acts were to be performed and had established a system of procedure, the 20th article did not relieve the city and county of Denver from their operation. While we were enabled to enjoy certain municipal privileges, we were still bound by all governmental measures which the state might see fit to adopt and enforce. *It was therefore with reference to these purely local and municipal affairs that the charter convention was authorized to act.*    *    *    *

"To state the matter in another form, so far as the municipality proper was concerned the charter might prescribe the jurisdiction of the officers created by it *so long as that jurisdiction was limited to municipal affairs and not in conflict with either the general law of the state or the constitution, but where the*

*constitution or the general law had spoken upon mat-*
*ters of a public and governmental nature not purely*
*municipal in their scope, the 20th article did not*
*affect them."*

If we are capable of comprehending the English
language, the foregoing quotation coincides with the
views expressed in the majority opinion in the Sours
case, which views must be and are decisive of this
case.

"The constitution is not to be made to mean one
thing at one time and another at some subsequent
time when the circumstances may have so changed as
perhaps to make a different rule in the case seem
desirable."—*People v. Scott,* 9 Colo. 433.

Counsel for respondent seek to avoid the force
and effect of the plain, unambiguous and positive
language of the court in the Sours case by arguing
that the learned justice who wrote the opinion of the
majority had in mind the "jurisdiction and duties of
public officers" only, and as they say that no attempt
has been made under the charter to legislate upon the
jurisdiction and duties of public officers, therefore the
language of the learned justice is not applicable to
that particular feature of the charter here under dis-
cussion.

A close analysis of the language of the opinion
discloses that there are three separate and distinct
things which the people cannot do even by constitu-
tional amendment:

1.    Free any portion of the state from the opera-
tion of the constitution.

2.    Delegate to a charter convention the making
of constitutional amendments.

3.    Give to a charter convention the power to
prescribe the jurisdiction and duties of public officers
with respect to state government as distinguished
from the municipal or city government.

Under the language used no one of the three things can be done by the people, and it follows that no *portion* of any one of them can be done; that no portion of the state can be freed from *any* provision of the constitution; that the first step along the road to the accomplishment of either one of the three prohibited acts is just as much prohibited as the second or third or last steps, and it is the duty of this court to promptly and emphatically call an immediate halt and a retreat whenever it is in a proper manner brought to the attention of the court that the first step has been taken or attempted along the forbidden highway.

It should constantly be borne in mind that article XX provides that cities of the first and second class may proceed thereunder, and who can say that if it should appear to other cities of the state that the charter of the city and county of Denver permitted the citizens thereof to depart from the straight and narrow path of constitutional limitation we might not have the spectacle of a procession of cities attempting to free themselves from the limitations of the constitution which might be irksome to them. Such a spectacle or condition would be intolerable, and is prevented by the ruling of this court in the Sours case.

The view we have taken of this case makes it unnecessary to consider other grounds, plausible and of much force, urged by learned counsel for the people and respondent, or to prolong this opinion by a discussion of many principles of law and authorities cited in support thereof to which our attention has been called by counsel for both parties.

Our conclusions are that the proposition presented by this record is not and since the decision of the Sours case has not been an open question; that it is there held that the authority of the charter conven-

tion to legislate under article XX of the constitution is limited to matters purely local and municipal in their character; that the provisions of the charter adopted March 29, 1904, increasing the number of judges of the county court to two and changing the time of election of said county judges to May 17, 1904, are invalid and inoperative; that respondent is not entitled to hold and exercise the office of county judge of the city and county of Denver; that the demurrer to the answer and return of respondent should be and is sustained.

This being an original proceeding in this court it is, therefore, considered and adjudged that the respondent, Henry V. Johnson, is guilty of usurping, intruding into and unlawfully holding and exercising the office of county judge of the city and county of Denver, state of Colorado, and that by the judgment of this court he, the said Henry V. Johnson, be ousted and excluded from said office and franchise and any and all exercise thereof, and that he pay the costs of this proceeding.

*Judgment accordingly.*

Decision *en banc.*

Mr. JUSTICE STEELE, dissenting:

Whether article XX of the constitution of Colorado does or does not confer upon the people of the city and county of Denver the power to provide by charter for an additional county judge within the city and county is a fairly debatable question, and depends upon an interpretation of the article itself with a view to determining its true intent and purpose. This the court has not attempted; but it has found in the general propositions announced in the Sours case to the effect that there must be, within every political subdivision of the state, some agency for performing the governmental duties of the state

in accordance with the general laws of the state, satisfactory authority for declaring it to be *"stare decisis,"* not only that there cannot be two county judges within the city and county of Denver, but that the plan of joint city and county government, by a single set of officers, as provided for by the article, must be overthrown and held for naught, and a double set of officers—city officers and county officers—installed and maintained in the single body politic and corporate known as the city and county of Denver. I shall, therefore, shorten the discussion by simply contending that there is nothing either in the Sours case, or in any other case, for that matter, to justify the conclusion of the court that the people of the city and county of Denver had no authority to legislate in any particular with respect to the offices of sheriff, treasurer, assessor, clerk and recorder, justice of the peace or constable, or dispense with county commissioners. I believe that they have just such authority as was conferred upon them by article XX—conferred expressly or by necessary implication—and none other. In the Sours case it was said, *arguendo,* that it would be subversive of state government to give to the people of the city and county of Denver the power to adopt *any measure,* in the broad sense contended for by counsel, and therefore the words in section 5, "or to adopt any measure as herein provided," were construed, as limited by the context, not to authorize the charter convention to propose measures changing governmental acts and duties; and it was held that such duties were intended to remain under the control of the legislature and of the general laws. There is nothing in the Sours case holding or intimating that these governmental duties could not be performed by a single set of officers for the city and county, or that such officers could not be elected at a single election; and no such construction was even

contended for by counsel opposing the amendment.
The Sours case was regarded by everybody, until a
controversy arose as to the power of the people by
charter to increase the number of county judges, as ·
settling the proposition that article XX was legally
adopted by the people as a part of the constitution,
and that it was feasible and legal throughout when
given the construction that in prescribing the "juris-
diction, term of office, duties and qualifications of all
such officers," it did not mean that the charter con-
vention could so prescribe in cases where it would
.operate to hinder the performance of the acts and
duties required of county officers to be done by the
constitution or by the general law, as far as appli-
cable to the changed conditions of the new municipal-
ity. In April, 1903, almost contemporaneous with the
decision in the Sours case, the court of appeals of
Colorado, in determining the case of *McMurray v.
Wright,* 19 Colo. App. 17, which directly required a
determination of the status of the officers of the new
municipality, by Thompson, P. J., said: "The cor-
poration created by the contsitutional amendment is
denominated the city and county of Denver. Its
boundaries embrace the territory formerly occupied
by the city and other territory belonging to Arapahoe
county. A complete county and city government is
furnished to the new corporation. The amendment
provides it with a mayor, council and other city
officers, and with a body having the authority of a
board of county commissioners, a sheriff, clerk,
recorder, county judge and all other county officers.
The duties of city officers are prescribed by the char-
ter, and the duties of county officers by the general
laws of the state. *That the city government and the
county government are in the hands of the same
persons is immaterial.* The distinction between the
functions pertaining to a city government and those

pertaining to a county government *is not and does not purport to be* affected by the amendment. While the city and county of Denver is a city, it is also a county; and any election lawfully held by its inhabitants *is a county as well as a city election.*   *   *   *

"The question before the court in that [the Sours] case was the validity of the amendment; but the language we have quoted is expressive of its opinion of the character of the corporation which was created by the amendment."

When this decision was rendered Mr. Justice Maxwell was a member of that court. The decision holds that the election for delegates to a charter convention is a county election, and that, under the decision in the Sours case, it is immaterial that the county government and city government are under the control of the same persons. Yet he concurred in that decision and failed to discover that the government provided by the article was subversive of state government or that it was unrepublican in form.

In the case of *People v. Adams,* decided at the April term, 1903, in 31 Colo. 476, Chief Justice Campbell, delivering the opinion of the court in a case involving also the status of the officers of the new municipality, said: "The avowed object of the general assembly in submitting and the presumed intent of the people in ratifying this amendment must be given effect if the language therein employed will allow, even if the result be a withdrawal of restraints upon officers which heretofore have been deemed by the general assembly expedient to prescribe or the consequences destructive of high efficiency in the discharge of public duty. *Its validity is no longer an open question.* Plaintiffs do not question it. Indeed, they rely upon it for their title. The fact that the writer of this opinion believed it inoperative and void when its validity was directly attacked should not

and does not lead him to nullify its provisions by hostile construction, nor does it comport with judicial propriety stubbornly to persist in further dissent from *a decision acquiesced in by all departments of government.* Rather is it the duty of every member of the court to give effect to the article in accordance with the intent of its framers as far as it can be done consistent with the language in which that intent has been manifested."

The case of *Watts v. Elder et al.,* in the circuit court of the United States for the district of Colorado, was decided on March 2, 1903. It was an action based upon the proposition that the government provided by article XX for the city and county of Denver was unrepublican, and in the opinion, by Marshall, J., it is said: "But it is claimed that article XX of the constitution of Colorado is in conflict with the state constitution and with that of the United States. So far as its conflict with the state constitution is concerned, that has been passed upon by a decision of the supreme court of this state. It is true that the opinion has not been handed down, but the decision has been made, and the article must be taken by us as an integral part of the constitution of Colorado. As such part it must be construed with other provisions of that constitution. If, then, there be a conflict, it does not mean that article XX is not a part of that constitution or is not itself valid, but that it to some extent alters a preexisting constitution of Colorado. With respect to its being in conflict with the constitution of the United States it is said that it in effect creates a state within the boundaries of another state. That contention we do not think well taken. It provides for the creation of a municipal corporation resting eventually on the will of the people, established by the will of the people of the entire state of Colorado. That agency of the government is not superior to the

creator. Established by the will of the people of Colorado, it may be annulled by the will of the people cf Colorado evidenced by some future constitutional amendment. It is in no sense a sovereign corporation, because it rests on the will of the people of the entire state and continues only so long as the people of the entire state desire it to continue. That the state has the power of establishing municipal corporations, changing their boundaries and annulling such corporations once established is, of course, familiar law. Such municipal corporations are ordinarily created by act of the legislature, but a state may create such corporations in the constitution itself by a constitutional amendment, and such corporations may be abolished and changed in like manner. * * * What then is the basis of the claim of the plaintiff that this amendment violates the constitution of the United States? It provides for a charter convention of twenty-one constitutional electors to frame a charter of government to be submitted to a vote of the people. This charter shall prescribe the duties of the officers of the new municipality and fix the limitation of local authority. By this amendment the city council of the new municipality is given the power to tax and right of taxation of city and county property, and no express limitation is placed on that power.

"It is contended under this such a charter may be framed that the 14th amendment will be violated; but this grant of authority is not without limits. It is not necessary that those limitations should be expressed in the amendment itself. It is a grant limited expressly by such other limitations as may be in the constitution of the state of Colorado. It is impliedly limited by the very purpose for which the grant is made, namely, by the fact that the authority is *to form* a charter for a municipal corporation for an agency of the state. It is impliedly limited by every.

inhibition of the constitution of the United States, however general in form the grant of power may be. It is not to be presumed that the people of the state of Colorado intended to grant a power to violate any provision of the constitution of the United States. They have not expressly done so; so that it seems to us that these broad grants of authority ought to be construed as impliedly restricted by the limitations of the paramount power; that it is simply intended to be a grant of an authority to act in accordance with the constitution of the United States. The electors would not be authorized to make a charter which violated the paramount law. If they attempted to make such a charter it may be very properly contended that so far as it violated the constitution of the United States it was void, and any one injured or who had an option to sue by reason of his property being affected by that charter could come into court and ask that any authority that was sought to be exercised in violation of the constitution of the United States should be restrained; those parts of the charter should be declared void. Such a question should be decided when a charter is enacted which does in fact violate the constitution of the United States in some particular. So far as the constitutional amendment is concerned, impliedly the authority is to act in conformity with that constitution. The objection that this charter government may be unrepublican in form is answered, it seems to us, by the same argument. There is no charter yet before the court. The court cannot presume that those formulating a charter may formulate one in violation of the constitution of the United States. The amendment to the constitution of Colorado does not contemplate a charter unrepublican in form; it contemplates one resting on the will of the people, one that is subject not only to the will of the people

in a particular municipality but is eventually subordinate to the will of the people of the entire state as that will may be expressed constitutionally. There is nothing in the amendment itself, it seems to us, that either expressly or impliedly authorizes the constitution of an unrepublican municipality."

Section 2 of article XX gives express authority to the charter convention to fix the term of office and compensation, and therefore the time of election of all officers of the new municipality. It is as follows:

"Sec. 2. The officers of the city and county of Denver shall be such as by appointment or election may be provided for by the charter; and the jurisdiction, term of office, duties and qualifications of all such officers shall be such as in the charter may be provided; but every charter shall designate the officers who shall respectively perform the acts and duties required of county officers to be done by the constitution or by the general law as far as applicable. If any officer of said city and county of Denver shall receive any compensation whatever he or she shall receive the same as a stated salary the amount of which shall be fixed by the charter and paid out of the treasury of the city and county of Denver in equal monthly payments."

The court reaches the conclusion that effect cannot be given to this constitutional provision by a very artificial line of reasoning in which every successive step goes farther and farther from the adjudicated cases and from sound principles of government.

It says: "This is not a question of whether a *mere change* in the *term* of office and *time* of election of an officer performing governmental duties is an act subversive of a republican form of government; the question is, can the people of the state by constitutional amendment set apart any portion of the

state and vest the citizens thereof with power to legislate upon matters other than those purely local and strictly municipal in their character. * * * If such plenary power to legislate cannot be granted a single act of legislation would be invalid even though it be legislation changing the term of office and the time of election of county officers performing state and governmental functions. To concede the right to legislate upon such matters *in the slightest partic-ular* must be to concede the right to legislate *on all matters,* and we would have a community of citizens representing one-third the population of the state legislating for themselves upon all matters and not subject to the general legislation of the state.''

The charter convention following the decision in the Sours case made no attempt to dispense with any constitutional or statutory requirement as to the jurisdiction, duties or qualifications of officers performing governmental duties; and so the question before the court really was whether that convention was authorized to make a mere change in the term of office and time of election of an officer performing governmental duties. And it does not follow by any rule of logic or of judicial construction that the exercise of a power expressly given that does not or cannot if reasonably or sensibly exercised interfere in the slightest degree with the governmental duties required to be performed within this consolidated city and county implies the right to legislate upon any other matter whatever. The right to legislate is to be found in article XX or does not exist; and it is *res adjudicata* by the Sours case that article XX is a part of the constitution of Colorado and therefore is itself constitutional.

The main contention in the Sours case was, not that the municipality created by article XX was unre-publican, but that the article embraced several sub-

jects and amended more articles of the constitution than was permitted by that instrument. It was conceded by all that many of the articles of the constitution were modified, limited or abrogated so far as the territory set apart as a new city and county was concerned by article XX.

Speaking to this subject Mr. Justice Gabbert said:

"The constitution is the paramount law of the state created by the people themselves. They have reserved the right to amend that law but wisely placed restrictions on the exercise of this power and prescribed a procedure to be followed in the proposal and submission of amendments to their fundamental law. They are not above this law and therefore cannot amend the constitution except through a substantial compliance with its provisions on the subject of amendment. *All the objections raised to article XX possessing any merit* involve the single one of whether or not this rule of law has been observed.    *    *    *

"That article XX does affect more than six preceding articles must be conceded; so the next proposition is, are these changes as pointed out by counsel for respondent other than incidental?    *    *    *

"The several provisions it contains appertain to the main subject which it embraces and while they do change and modify the organic law so far as the muncipalities affected are concerned these modifications are only the natural results following the new plan of government provided specially for them through which these changes are effected; hence they are mere incidents of the main purpose of the amendment and do not amend the constitution in the sense that it was intended to inhibit by the limitation on the power of amendment through legislative proposal."—*People v. Sours,* 31 Colo. 407, 409.

Mr. Justice Campbell stated that, in his opinion, ten and probably sixteen articles were amended or repealed by the article, and the writer of the majority opinion concluded that it amended different articles of the constitution. Article XIV, which provides for the election of county officers, names them and fixes their terms, was especially called to the attention of the court, and while it was conceded that this article was amended as far as Denver was concerned it was held that this did not render article XX invalid. This court upheld the article as a valid amendment. It was accepted by the people of the city and county and of the state. Charter conventions composed of the leading citizens of both parties proposed charters. One was rejected, but both the charter rejected by the people and the one ratified contain ample provisions concerning the election and appointment of officers to perform county functions. The officers elected performed their duties. The bonded indebtedness of the city and county was refunded by the officers of the city and county.

After two years under the form of government provided by article XX, resulting in the saving of thousands of dollars in expense, we are now told that the government is unrepublican in form and that the people are violating the compact with the federal government in conducting their affairs in accordance with the provisions of article XX.

By the constitution and laws of Missouri a procedure was provided for the city of St. Louis and several adjacent counties differing materially from the procedure provided for in other portions of the state. The supreme court of the United States upheld the power of the state to restrict the right of appeal to the supreme court of the state by providing that within certain counties of the state of Missouri and in certain cases the decisions of the St. Louis

court of appeals should be final although a similar case arising in any other part of the state would be appealable to the supreme court of the state. It has no bearing upon the questions discussed by the court further than to show how very far from being unrepublican in character is the provision in article XX that the people of Denver may fix the term of office and compensation of officers performing the duties of county officers. Mr. Justice Bradley delivering the opinion of the court said:

"It is the right of every state to establish such courts as it sees fit and to prescribe their several jurisdictions as to territorial extent, subject-matter and amount, and the finality and effect of their decisions, provided it does not encroach upon the proper jurisdiction of the United States and does not abridge the privileges and immunities of citizens of the United States and does not deprive any person of his rights without due process of law, nor deny to any person the equal protection of the laws, including the equal right to resort to the appropriate courts for redress. The last restriction as to the equal protection of the laws is not violated by any diversity in the jurisdiction of the several courts as to the subject-matter, amount or finality of decision if all persons within the territorial limits of their respective jurisdictions have an equal right in like cases and under like circumstances to resort to them for redress. Each state has the right to make political subdivisions of its territory for municipal purposes and to regulate their local government. As respects the administration of justice it may establish one system of courts for cities and another for rural districts, one system for one portion of its territory and another system for another portion. Convenience if not necessity often requires this to be done, and it would seriously interfere with the power of a state to regu-

late its internal affairs to deny to it this right. We think it is not denied or taken away by anything in the constitution of the United States including the amendments thereto.

"We might go still further and say with undoubted truth that there is nothing in the constitution to prevent any state from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the state of New York for example should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties and the common law and its method of procedure for the rest of the state there is nothing in the constitution of the United States to prevent its doing so. This would not of itself within the meaning of the 14th amendment be a denial to any person of the equal protection of the laws. If every person residing or being in either portion of the state should be accorded the equal protection of the laws prevailing there he could not justly complain of a violation of the clause referred to. For, as before said, it has respect to persons and classes of persons. It means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances.

"The 14th amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two states separated only by an imaginary line. On one side of this line there may be a right of trial by jury and on the other side no such right. Each state prescribes its own modes of judicial proceeding. If diversities of laws and judicial proceedings may exist in the several states without violating the equality clause in the 14th amendment there is no

solid reason why there may not be such diversities in different parts of the same state. A uniformity which is not essential as regards different states cannot be essential as regards different parts of a state provided that in each and all there is no infraction of the constitutional provision. Diversities which are allowable in different states are allowable in different parts of the same state. Where a part of a state is thickly settled and another part has but few inhabitants it may be desirable to have different systems of judicature for the two portions—trial by jury in one, for example, and not in the other. Large cities may require a multiplication of courts and a peculiar arrangement of jurisdictions. It would be an unfortunate restriction of the powers of the state government if it could not, in its discretion, provide for these various exigencies.

"If a Mexican state should be acquired by treaty and added to an adjoining state or part of a state in the United States and the two should be erected into a new state, it cannot be doubted that such new state might allow the Mexican laws and judicature to continue unchanged in the one portion and the common law and its corresponding judicature in the other portion. Such an arrangement would not be prohibited by any fair construction of the 14th amendment. It would not be based upon any respect of persons or classes but on municipal considerations alone, and a regard to the welfare of all classes within the particular territory or jurisdiction."—*Missouri v. Lewis*, 101 U. S. 22.

The same question as to the power of a charter convention to *legislate*, as the court puts it, concerning officers charged with governmental duties that is passed upon by this court in this case was before the supreme court of California in the case of *Martin v. Election Commissioners*, 126 Cal. 406. The city and

county of San Francisco had been in existence as a consolidated city and county government for a good many years, it having been consolidated and new boundaries fixed by an act of the legislature in 1856, and further consolidated by constitutional provisions in 1879. Upon account of other express provisions in the constitution of California not in conflict with the provisions relating to the consolidated city and county it had been held that the general laws of the state as to the time of election of county officers prevailed within the city and county of San Francisco as well as elsewhere throughout the state. In 1896 an amendment to the constitution was adopted as follows: "4. * * * Where a city and county government has been merged and consolidated into one municipal government it shall also be competent in any charter framed under said section 8 of said article XI to provide for the manner in which, the times at which, and the terms for which the several county officers shall be elected or appointed, for their compensation, and for the number of deputies that each shall have and for the compensation payable to each of such deputies."

The same objections were there argued that are here adopted by the court, for, in the opinion of the court by Van Dyke, J., it is said: "In the complaint of the plaintiffs it is stated: 'That the action is not designed or intended to impeach the validity of the said charter in any respect other than to have it adjudged herein that the provisions of said charter concerning the county officers of said city and county of San Francisco are in open and flagrant conflict with the constitution of the state of California, are an *invasion of and an infringement upon the sovereignty of said state,* are a *revolutionary usurpation of power,* and are a palpable violation of the law adopted by the legislature of said state in obedience

to the constitution and entitled 'An act to establish a uniform system of county and township government,' approved April 1, 1897.''

The court held as stated in the syllabus that:

''The city and county of San Francisco as a merged and consolidated municipal government was authorized under sections 7 and 8 of article XI of the constitution to adopt a freeholders charter, and under section 8½ of that article adopted in 1896 was authorized to fix in such charter the manner in which, the times at which, and the terms for which the several county officers shall be elected or appointed.''

''In the construction of the constitution special provisions control the more general provisions, and the general and special provisions operate together, neither working the repeal of the other. Section 8½ of the constitution is valid and operative as to the cases therein specially provided for notwithstanding the general provisions of the constitution for laws establishing a uniform system of county and township government.''

''The freeholders charter of the city and county of San Francisco operates under section 8 of article XI as amended to supersede all laws inconsistent therewith whether special or general.''

Section 7 of article XI of the constitution of California is as follows: ''Sec. 7. City and county governments may be merged and consolidated into one municipal government *with one set of officers* and may be incorporated under general laws providing for the incorporation and organization of corporations for municipal purposes. The provisions of this constitution applicable to cities and also those applicable to counties so far as not inconsistent or prohibited to cities shall be applicable to such consolidated government.''

Afterwards, in April, 1901, the supreme court of California in *Crowley v. Freud,* 132 Cal. 440, again very carefully considered the powers of legislation granted to the people of the city and county of San Francisco. The controversy arose as to the power to prescribe civil service regulations controlling the appointment of the deputies of county officers. The opinion of the court by McFarland, J., is as follows:

"The only question presented in this case is whether the consolidated municipal government called the city and county of San Francisco can, through its civil service commission, prescribe the qualifications of deputies of certain county officers such as sheriff, county clerk, recorder, etc., and compel those officers to select their deputies from persons named by said commission. The court below held that there is no such power, and in accordance with such ruling made certain restraining and enjoining orders from which defendants appeal. The power in question does not exist unless it is granted in that clause of section 8½ of article XI of the state constitution adopted in 1896 which is as follows: 'Where a city and county government has been merged and consolidated into one municipal government it shall also be competent in any charter framed under said section 8 of said article XI to provide for the manner in which, the times at which, and the terms for which the several county officers shall be elected or appointed, for their compensation and for the number of deputies that each shall have, and for the compensation payable to each of such deputies.'

"It is scarcely necessary to again consider at length the position of appellants—so elaborately discussed and so clearly held to be untenable in *Kahn v. Sutro,* 114 Cal. 316—that there is no such thing as 'county officers' in that part· of the state which is included within the boundaries of the city

and county of San Francisco; for the clause of section 8½ of the constitution above quoted directly recognizes such officers and expressly calls them 'county officers,' and the whole clause deals with *county officers* and their deputies and with no other subject whatever.

"In the opinion in *Kahn v. Sutro, supra,* the citation of authorities is very full, and it would be a mere' waste of labor to restate here the reasoning there employed or again refer to the authorities there cited. That case establishes the law as to the matters therein determined. It is proper, however, to notice the contention of appellants that *Kahn v. Sutro* has been overruled or materially modified by the subsequent case of *Martin v. Election Commissioners,* 126 Cal. 404. There is no foundation for this contention. *Kahn v. Sutro* was decided before section 8½ became a part of the constitution, and it was there held that under the constitution and the statutes as they then stood the terms of office and the times of election of county officers were fixed by the general state laws on the subject; but the Martin case was decided after section 8½ had been adopted and was based entirely on the amendment made by that section, ·which expressly makes the law as to the election, etc., of county officers different from the law as it stood on that subject when *Kahn v. Sutro* was decided. The Martin case was brought by certain county officers in San Francisco upon the theory that the adoption of section 8½ had not changed the law declared in *Kahn v. Sutro* as to the time of their election and their terms of office; and this court held in the Martin case that those things had been changed by section 8½, because it declared that it was competent to provide in the charter of a consolidated city and county government ·'for the manner in which, the times at which, and the terms for which the several county

officers shall be elected.' This was the only question involved and the only question decided—the only question to which the minds of the court were directly called and upon which they directly acted. The contention of appellants is based mainly upon one or two expressions to be found in the opinion in the Martin case. One of these, and the main one, is as follows: 'But the act establishing a uniform system of county and township governments does not and never did apply to the county of San Francisco *in the sense claimed by the appellants.*' This, however, is not saying that it does not apply *in any sense.* And what *was* the sense in which appellants in that case claimed such application? They 'claimed' briefly stated as follows: Section 6 of article XI provides that all municipal charters shall be, except in municipal affairs, 'subject to and controlled by general laws;' county officers not being within the exception of 'municipal affairs,' the county government act which provides for their election, time of office, etc., 'controls the provisions of the charter on that subject,' and section 8½ can be kept out of conflict with section 6 only by a construction which is stated in appellants' brief in the Martin case in this language: 'The only construction admissible therefore is that which renders section 8½ subject to section 6 by permitting a charter to provide for the appointment, election, tenure and compensation of county officers and their deputies only where *there is no general law on the subject;* the charter to be superseded in that respect whenever a general law is adopted.' They also contended that section 8½ could not be legally adopted as an 'amendment,' and that what was attempted thereby could only be done through a general revision by a constitutional convention. And they argued that for the foregoing reasons and for many others which were urged section 8½ is not an

existing amendment and therefore the county gov-
ernment act applies to San Francisco *for all purposes.*
The above views of counsel show the application of
the county government act of San Francisco, 'in
the sense claimed by the appellants.'   But the court
did not agree with these views, and held that section
8½ was a valid amendment and that by its express
terms it provides for the election and terms of office
of the county officers of the city and county of San
Francisco; and it is with respect to the contentions
of appellants in the Martin case that the expression
above quoted must be taken.  And a somewhat broader
expression in the opinion following closely after the
one above noticed must be taken as subject to
the same qualifications as the first.   It is nowhere
in the opinion stated that there are no county officers
in the city and county of San Francisco; on the
other hand, it recognizes the existence of such
officers as section 8½ itself does.   For instance
in the constitutional convention Judge Hager
in replying to the objection that consolidated
governments multiplied officers and increased ex-
penses said that the opposite was the result, and
referred to the consolidated government of San
Francisco as sustaining his position; and in the
opinion in the Martin case the following from his
remarks is quoted: 'We have a sheriff who is sheriff
of *the county* and of the city.   *   *   *   We have a
tax collector and we have an auditor that acts *for
both;* formerly we had one *for each.'*   Whether
there were county officers in San Francisco was not
a question in the Martin case, and there was no pre-
tense of overruling *Kahn v. Sutro* on that subject;
the only question involved was, When are *county
officers* to be elected, and what are their terms of
office?   *Miller v. Curry,* 113 Cal. 644, is to the same
effect as *Kahn v. Sutro.*

"The fact that in a consolidated city and county there is neither a separate county governmental organization nor a separate city governmental organization each distinct from and entirely independent of the other—as there is in ordinary counties and cities—was as fully recognized in *Kahn v. Sutro* as in *Martin v. Election Commissioners*. There is no conclusiveness in the argument that there can be no county officers for a consolidated government because to hold otherwise would be to violate the original section 4 of article XI of the constitution which contemplates a 'uniform' system of county government; for other provisions of the constitution, mostly amendments and particularly section 8½, which are specific provisions on the subject, allow such want of uniformity in the case of a consolidated city and county government and expressly apply provisions to county officers in such consolidated government which do not apply to officers in other counties.

"Not only is the state itself interested in county officers as parts of its necessary governmental machinery, but the people of any particular county of the state are interested—and some of them are frequently deeply interested—in county officers such as sheriffs, recorders, clerks, etc., in other counties. The functions of such officers are general, not municipal. And while in the American system of state governments the people of the whole state have generally kept in their own hands control over such important public governmental agencies as county officers, still if they choose to yield up part of that control by adopting a constitutional amendment such as section 8½ there is no apparent reason why they may not do so unless the amendment should be so revolutionary as to be destructive of a republican form of government as the same is understood in this country. Section 8½ cannot be said to be of that

character. But when the people of the whole state have thus yielded up part of their sovereign power to a local municipality, the grant will certainly not be carried by construction to any greater extent than the words of the granting amendment clearly go. By section 8½ power over county officers is given to the municipality only to the extent of providing for the manner of election and their terms of office and compensation. As to their deputies—and they alone are involved in this action—the only power granted is to provide 'for the number of deputies that each shall have and for the compensation payable to each of such deputies.' By no reasonable stretch of construction can this be held to include the power to prescribe the *qualifications* of such deputies by any mode or process whatever.

"The foregoing views are conclusive of the case in favor of the respondent; and it is not necessary to pursue in detail the various points and arguments made by counsel for either side in support of their respective contentions.

"The orders appealed from are affirmed."

Immediately following the case of *Crowley v. Freud* is the case of *Cahen v. Wells,* 132 Cal. 447, in which it was sought to enjoin the defendant, Wells, who was auditor of the city and county of San Francisco, from drawing any warrant in payment of salary of the civil service commission or of any expenses of the commission on the ground that all the provisions of the charter on the subject of civil service were unconstitutional and void. I quote the following from the opinion of the court, by McFarland, J.:

"Appellant contends that section 12 is unconstitutional and invalid because it provides for a life tenure of office and is therefore in violation of section 16 of article XX of the state constitution, which is as

follows: 'When the term of any officer. or commissioner is not provided for in this constitution, the term of such officer or commissioner may be declared by law, and if not so declared such officer or commissioner shall hold his position as such officer or commissioner during the pleasure of the authority making the appointment, *but in no case shall such term exceed four years.*' * * * His (appellant's) positions therefore are: 1. That section 12 is unconstitutional, and 2. That its unconstitutionality carries with it the unconstitutionality of the whole scheme of civil service presented in the charter, all the provisions being so inseparably blended that no part can stand if other parts are invalid.

"In our view of appellant's second position it is not necessary for us to determine whether or not his first position is tenable. We have not before us the case of a person who having been appointed under the civil service provisions of the charter and having held his position for more than four years claims to be entitled to hold it for life. Whether or not section 12 undertakes to provide for terms of office in excess of the limitations of section 16 of article XX of the constitution; whether or not all persons dealt with by article XIII of the charter are within the description 'officer,' as used in said section 16; whether or not the head of an office might remove a subordinate without the consent of the commission— these and other questions which would be involved in passing on the constitutionality of section 12 can be more properly determined as the facts of future cases may present them. In the present action they are remote, general and speculative."

And so I say that this court ought to have held that the provisions of article XX empowering the people of the city and county to have for their new municipality a single set of officers, to be elected or

appointed at such times as the charter might provide, was a valid provision not subversive of state government or unrepublican in form, and that the suggestion that the people might select officers for life was too remote and too speculative to be entitled to serious consideration.

In the Sours case it was said: "Under the constitution of the United States the state government must be preserved throughout the entire state; and it can be so preserved only by having within every political subdivision of the state such officers as may be necessary to perform the duties assumed by the state government under general laws as they now exist or as they may hereafter exist." And it was held that it was not contemplated by the article to relinquish state government within the city and county of Denver because the article expressly provided that the charter adopted should designate the officers who should perform the acts and duties of county officers. Because the article provided that the citizens of the city and county of Denver should have exclusive power to adopt a new charter or to adopt any measure it was contended that the constitution and laws and the general assembly were displaced within the city and county, and to answer this statement it was said in addition to what I have quoted, "The amendment is to be considered as a whole in view of its expressed purpose of securing to the people of Denver absolute freedom from legislative interference in matters of local concern." The writer of the opinion was not undertaking by hostile construction to nullify the article XX nor to argue away the plain provisions of the article which do not admit of interpretation or construction because they interpret themselves, but he was undertaking to give the effect intended by the people. The provisions of the article that the offi-

cers of the city and county of Denver shall be such as by appointment or election may be provided for by charter can have but one construction. But the language of section 5 of the article providing that the citizens of Denver shall have the exclusive power to amend their charter or to adopt a new charter or to adopt any measure as therein provided was claimed to extend to every subject and was authority for the people of Denver to enact any law embracing any subject. And it was held that the authority of the people to legislate through charter and otherwise extended only to matters of local concern, that is, to matters affecting the new municipality. That did not mean that the city and county should not provide for its officers as expressly directed by article XX; it did mean that the people of Denver were not given power nor was it intended to grant them power to legislate upon general subjects such as crimes, negotiable instruments, civil procedure or any other subject not applicable to local government except as directed and empowered by article XX.

The court says that it is held in the Sours case that the people cannot:

"1. Free any portion of the state from the operation of the constitution.

"2. Delegate to a charter convention the making of constitutional amendments.

"3. Give to a charter convention the power to prescribe the jurisdiction and duties of public officers with respect to state government as distinguished from the municipal or city government."

Although the language used is not that employed by the writer of the opinion in the Sours case it is sufficiently accurate for the purposes of this discussion. The writer did say in substance that which is attributed to him, but the conclusions drawn from what he said are to be found neither

in the Sours case nor in any other case. The court says: "Under the language used no one of the three things can be done by the people, and it follows that no *portion* of any of them can be done; that no portion of the state can be freed from *any* portion of the constitution."

It requires a reversal of the decision in the Sours case to reach the conclusion that no portion of the state can, by constitutional amendment, be freed from any provision of the constitution. For it was held in positive language in that case not only that the people *could* but that they *had* freed Denver from several provisions of the constitution by making article XX a part of their constitution. But because it is stated in the opinion in the Sours case that it was the express purpose of article XX to secure to Denver freedom from legislative interference in matters of local concern it is asserted that, "If the majority of the court in the Sours case had been of the opinion that article XX had for its purpose the securing to the people of Denver absolute freedom from legislative interference *in all matters* relating to county and state governmental offices, officers and functions, the inevitable conclusion would have followed that the amendment would have been held subversive of a republican form of government and repugnant to the constitution of the United States." The court then proceeds to show that the provisions of the charter are in conflict with article VI of the constitution. It was held in positive terms in the Sours case that article XX did amend, limit, repeal or abrogate very many of the articles of the constitution but that such changes were incidental merely and did not render article XX invalid; that article XX created a new sort of municipality having the combined powers of city and county government; that the powers of city and county municipalities being essen-

tially different, in investing this new municipality
with the powers of both, it became necessary to
modify the provisions of the constitution relative to
municipal affairs by providing new ones applicable
to such combined government. "But," it was said,
"this is not an amendment of those provisions such
as in our judgment was in contemplation by the
framers of the constitution, because the constitutional
provisions that are abrogated as to the city and
county of Denver remain in force generally through-
out the state." And when the court holds that the
charter provision relative to county judges is invalid
because it violates article VI of the constitution and
holds that other provisions of the constitution are vio-
lated when the charter provided for the terms and
qualifications of other county officers it ignores the
provisions of article XX, overlooks the fundamental
rule in the construction of constitutions and statutes
that a special provision controls the general one and
that both may stand; misconstrues the decision in
the Sours case which holds that article XX amended
and modified very many of the articles of the
constitution by making special provisions for the
government of Denver; and bases its decision upon
a doctrine the direct opposite of that maintained in
the Sours case. For when the people of the state
granted to Denver by article XX power to select pub-
lic officers, fix their salaries, designate a time for their
election, although they relinquished a power thereto-
fore retained by them or delegated to the legislature,
they but granted Denver power to legislate in mat-
ters of local concern; and when the people required
that the charter of the city and county should desig-
nate the officers who should respectively perform the
acts and duties required of county officers to be done
by the constitution or by the general law as far as
applicable, they declared that they did not relinquish

the right to require the performance of governmental duties within the territory of the city and county and they did not free Denver from the constitution, because article XX is a part of the constitution and every article of the constitution is applicable to Denver unless article XX otherwise provides.

The people of the state created of the territory a municipality with county and city powers. The boundaries of the city and county were coterminous, the territory densely populated. Property within the territory was owned by county and city and town governments and was by article XX declared to be the property of the city and county. Within the territory were several school districts. By the article they were consolidated. No reason is apparent why there should be two treasurers to handle funds raised by taxation or why there should be two bodies having control of the streets and alleys and bridges of the city and county with power to keep them in repair; or why there should be two boards in control of city and county property, or why there should be two attorneys, one to represent the city and one the county; or why there should be two boards within the territory to levy taxes, one to make a levy for city purposes and one for county purposes. The people in their sovereign capacity said there should be one set of officers, and this economical scheme of government should have been upheld and not overthrown.

The court says: "If the people of Denver by article XX are authorized through a charter convention to change the term of office, time of election and number of incumbents of one state or county governmental office they are authorized to change all of them, and in any respect they may see fit. The tenure of office might be made for life with power to name a successor, in which event there would be

no election; ten county judges instead of one might be appointed or the office might be abolished and the mayor, the sheriff or any other officer designated to perform the duties of county judge, or one person might be designated to perform all the duties of all county officers.''

To one who has lived there practically all his life the assumption that the people of Denver would use the power granted them by the constitution as a mere plaything is preposterous. The question is, Did the people of the state grant power to the people of Denver to name their officers for such terms and at such times as by a charter adopted by the people should be determined? This is not answered by the assertion that if the people have such power they might misuse it. I know of no power that we have to declare a constitutional provision invalid because we deem it unwise. But if the charter had provided for ten county judges and had provided that they should hold their terms for life, with the power of naming their successors—if the constitution of the state authorized it—it should be upheld because there is nothing in the federal constitution or in the enabling act prohibiting such a provision; and a charter with such a provision in it is not unrepublican, because the people of Denver have retained the power of changing the provisions of the charter, and the people of the state have retained the power of changing or annulling the article.

Finally, the charter ratified by the people was framed by a body of eminent citizens chosen from the various callings they represented because of their known ability, long residence in the state, and familiarity with the needs of Denver and the desires of her people. Several of the lawyers in that body had appeared before this court in the Sours case opposing the validity of article XX. The construction given to

the decision in that case by these gentlemen and the other members of the convention is shown by reference to the charter provisions. That they were not undertaking to free Denver from the constitution or attempting to evade the performance of governmental duties within the city and county of Denver or undertaking to make a farce of the proceeding for the framing of the charter is evidenced by section 156, which is as follows:

"Sec. 156. Except as otherwise herein provided the officers who shall respectively perform the acts and duties required of county officers to be done by the constitution and the general laws in all cases not specifically provided for so far as applicable shall be as follows: The county judges shall perform the acts and duties required of county judges; justices of the peace, the acts and duties required of justices of the peace; constables and deputy constables, the acts and duties required of constables; the engineer, the acts and duties required of county surveyor; the board of supervisors, the acts and duties required of boards of county commissioners; the board of supervisors shall act as a board of equalization and perform the acts and duties required of a board of county commissioners when sitting as a board of equalization; the assessor, the acts and duties required of county assessor; the treasurer, the acts and duties of a county treasurer; the sheriff, the acts and duties required of sheriff; under-sheriffs, the acts and duties required of under-sheriffs; deputy sheriffs, the acts and duties required of deputy sheriffs; recorder, the acts and duties required of county clerk as ex officio recorder; the coroner, the acts and duties required of coroner; the election commission, the acts and duties required of a board of county commissioners, county clerks and justices

of the peace in all matters pertaining to registration and elections.

"In case no officer has been specifically mentioned to perform the duties of any county officer, or in case any new county office is created, then such office shall be filled by appointment by the mayor, who shall appoint thereto some official of the city and county who shall thereafter perform the acts and duties required by the constitution or by the general laws to be done by such county officer."

Wherever the question has been presented the courts have given effect to the wishes of the people and sustained the power to establish the form of government here provided as not being in violation of the federal constitution and not in excess of the powers of the people to so provide in their organic law. And it is to be regretted that this court felt in duty bound to undo the work of the charter convention and to deny the people of this city and county the right to provide for a simple and economical plan of government as directed by the constitution.

Mr. JUSTICE GUNTER concurs in dissenting opinion of Mr. JUSTICE STEELE.