## No. 14,320.

McKay *v.* Public Utilities Commission et al.

(91 P. [2d] 965)

Decided May 29, 1939.   Rehearing denied June 26, 1939.

Mr. Marion F. Jones, Mr. John P. Beck, for plaintiff in error.

Mr. Byron G. Rogers, Attorney General, Mr. James J. Patterson, Assistant, Mr. Richard E. Conour, Elizabeth A. Conour, Mr. Myron H. Burnett, for defendants in error.

*En Banc.*

Mr. Justice Bock delivered the opinion of the court.

This action was instituted in the district court by plaintiff in error McKay, hereinafter mentioned as petitioner, to obtain a review, and ultimately a judgment, setting aside certain findings and orders of the Public Utilities Commission, one of the defendants in error, entered upon a complaint filed by it April 2, 1936, and a similar one presented by the Northeastern Motor Freight Company of date April 9, 1936, whereby petitioner was adjudged to have violated the terms of his permit to operate and certain provisions of the Motor Vehicle Carriers statute as specified. The review was sought under section 52, chapter 137, '35 C. S. A., the procedure being sanctioned by our holding in *Greeley Transportation Co. v. People,* 79 Colo. 307, 245 Pac. 720. We believe a somewhat detailed statement of the proceedings necessary to an understanding of the questions involved.

The two complaints were consolidated, and hearings held thereon June 30, 1936, and September 14, 1936, respectively. Thereafter, March 1, 1937, the commission made the following findings: (1) That petitioner has accepted and transported freight on joint through rates to Sterling, billed and destined to points on lines of various connecting carriers with whom he interchanged said freight; (2) that he has listed said connecting carriers as his customers; (3) that said listing was and is unlawful and contrary to the commission's present rules and

regulations; (4) that the advertising cards distributed by him to his customers were and are in violation of the rules and regulations of the commission; (5) that he has improperly operated as a common carrier in interstate commerce, and as a private carrier in intrastate commerce, over the same route, at the same time, with the same equipment, and under the same trade name; (6) that the private permit theretofore issued to petitioner should be cancelled and revoked, unless and in lieu thereof respondent pay $200 as a penalty, and cease and desist from performing and doing the things of which complaint has been made.

Based upon these findings, the commission entered an order cancelling and revoking respondent's Private Permit No. A-44, provided that in lieu thereof he may pay $200 as a penalty under section 61, chapter 137, '35 C. S. A.; that petitioner cease and desist, (1) from accepting and transporting any freight destined to points not authorized to be served by him under the terms of his permit; (2) from interchanging freight with other carriers by motor vehicle, either common or private; (3) from violating Rule 19 of the rules and regulations of the commission relating to advertising effective September 1, 1936; and (4) from operating as a common carrier in interstate commerce and as a private carrier in intrastate commerce. No issue is made in the record of the validity of the alternative order providing for a penalty in lieu of revocation.

Thereafter petitioner filed an application for rehearing, setting forth numerous grounds comprehended in the following: (1) That the commission, in entering said orders, exceeded its jurisdiction; (2) that the findings of the commission are unlawful for the reason that they have no support in law or the evidence submitted. In denying the petition for rehearing and in construing its order, the commission said: "The purport of our order is * * * to require him [respondent] to cease and desist from operating as a common carrier in intrastate

commerce without first having obtained a certificate of public convenience and necessity   *   *   *."

Reduced to a minimum, what the commission found was that respondent was operating as a common carrier in intrastate commerce without first having obtained a certificate of public convenience and necessity therefor, and it entered an order cancelling his private permit for having done so and requiring him to cease and desist from so continuing.

■■ Counsel for petitioner as well as counsel for respondents urge us, in view of the confusion, growing pains and chaos of truck transportation in this state, to establish definite principles of conduct governing truck-carrier operations. We have no power to establish such principles. All we can do is to ascertain the legislative intent and interpret the statutes and decide whether, under the facts and circumstances, the commission was authorized to enter the orders of which complaint is made. A review of the legislative enactments governing motor vehicle transportation over the public highways of this state will, in our opinion, be helpful. Prior to the enactment of chapter 134, S. L. '27, page 419, motor vehicle transportation was controlled by the public utilities law, chapter 137, '35 C. S. A. The regulations imposed by that legislation related solely to common carriers. Chapter 134, supra, is a special act to regulate motor vehicle common carriers, and it defines such operations in section 1 (d), as follows: "(d) The term 'motor vehicle carrier' when used in this act means and includes every corporation, person, firm, association of persons, lessee, trustee, receiver or trustee appointed by any court, owning, controlling, operating or managing any motor vehicle used in serving the public in the business of transporting persons or property for compensation over any public highway between fixed points or over established routes, or otherwise, who indiscriminately accept, discharge and lay down either passengers, freight or ex-

press, or who hold themselves out for such purpose by advertising or otherwise."

This section was subsequently amended by section 1 (d), chapter 121, S. L. '31, p. 481, chapter 16, section 300 (d), '35 C. S. A., and reads as follows:

"(d) The term 'motor vehicle carrier,' when used in this act, means and includes every corporation, person, firm, association of persons, lessee, trustee, receiver or trustee appointed by any court whatsoever, owning, controlling, operating or managing any motor vehicle used in serving the public in the business of the transportation of persons or property for compensation as a common carrier over any public highway between fixed points or over established routes, or otherwise, whether such business or transportation is engaged in or transacted by contract, or otherwise.

"The fact that any such person carries on his said operations:

"a. In whole or in part between substantially fixed points or over established routes; or

"b. Under contracts with more than one person or corporation; or

"c. By making repeated or periodical trips, shall be prima facie evidence that such person is a motor vehicle carrier hereunder."

This section was in effect during the pendency of the instant litigation. Not until 1931 was there any legislative action to authorize the regulation of private or contract carriers. Chapter 120, S. L. '31, p. 465. The term "private carrier by motor vehicle" was therein defined (section 1 (h)) as follows: "(h) The term 'private carrier by motor vehicle' means every corporation or person, lessee, trustee, receiver or trustee appointed by any court whatsoever, other than motor vehicle carriers as defined by Section 1-(d) of Chapter 134 of the Session Laws of Colorado for the year 1927, as amended, owning, operating, controlling or managing any motor vehicle in the business of transporting persons or property for

compensation over any public highways of this State between fixed points or over established routes, or otherwise, by contract or otherwise, and shall include all persons or corporations operating their own motor vehicles for the transportation of their own property, goods or merchandise, who charge or collect from the consignee, purchaser or recipient of such property, goods or merchandise, compensation for transporting or delivering the same."

This section was subsequently amended (S. L. '35, p. 867, section 1-[h], chapter 16, section 348-[h], '35 C. S. A.), and reads as follows:

"(h) The term 'private carrier by motor vehicle' means every corporation or person, lessee, trustee, receiver or trustee appointed by any court whatsoever, other than motor vehicle carriers as defined by section 1 (d) of chapter 134 of the Session Laws of Colorado for the year 1927, as amended, owning, controlling, operating or managing any motor vehicle in the business of transporting persons or property of others for compensation or hire over any public highway of this state between fixed points or over established routes, or otherwise, by special contract or otherwise.

"Private carriers by motor vehicle are hereby divided into two classes for the purposes of this Act, which shall be as follows:

"(1) Class A private carriers shall embrace all private carriers by motor vehicle operating over substanitally regular or established routes or between substantially fixed termini; or to a fixed terminus or termini;

"(2) Class B private carriers shall embrace all private carriers by motor vehicle who do not operate over substantially regular or established routes or between substantially fixed termini."

In 1935 the legislature (S. L. '35, chapter 167, p. 880) authorized the regulation of another type of motor vehicle carrier designated as "commercial carrier by motor vehicle," which is defined by section 1 (g), section 327

(g), chapter 16, '35 C. S. A. This legislation seeks to regulate motor vehicle operators transporting property sold or to be sold by the carrier. In other words, it involves a joint enterprise by the carrier of sale and transportation. This act is not involved in the instant litigation and we are not here concerned therewith except as it shows the legislative development of motor vehicle carrier regulation in this state.

We have held that home rule cities are not under the authority of the Public Utilities Commission in the regulation of motor vehicle common carriers whose operations are limited to the municipal area. *Denver v. Mountain States Tel. & Tel. Co.*, 67 Colo. 225, 184 Pac. 604; *Atchison, Topeka & S. F. Ry. Co. v. Public Utilities Commission*, 68 Colo. 92, 188 Pac. 747; *Spears v. Public Utilities Commission*, 100 Colo. 369, 67 P. (2d) 1029.

A consideration of these three acts regulating motor vehicle common carrier, private carrier and commercial carrier, convinces us that the legislative intent was to coordinate motor vehicle transportation operation for hire or compensation upon the public highways of this state in separate compartments, so that there would be no serious conflict, and to aid efficient regulation in the public interest.

Related to this problem of coordination, we quote the following from Pond on Public Utilities, section 706 (4th ed.), pages 1424-1425: ''The rapidly increasing use of motor vehicles for hire, whether as private or common carriers, makes the subject of their proper regulation and control the most important of all our modern transportation problems. The final determination of their own relations among themselves and with other common carriers is one of the most difficult, far-reaching and fundamental of all our transportation problems, requiring early solution. The proper sphere of each form of transportation and its relation to all others, invites the questions of whether they are to be coordinated or be competitive, whether one form should exclude all others, and

if not, how the new form by motor vehicles shall be co-ordinated with the present systems of local transportation and with each other if operating on the competitive plan, and demands the best thought and most serious consideration of all who have made the subject a special study, together with those who are actively engaged in this field of operation and investment.''

That the legislative intent to coordinate motor vehicle transportation is clear may be ascertained from the language used in section 350, chapter 16, '35 C. S. A., relating to private carriers, a part of which we quote, as follows:

''It is hereby declared that the business of private carriers by motor vehicle as defined in this subdivision, is affected with a public interest and that the safety and welfare of the public traveling upon such highways, the preservation and maintenance of such highways, and the proper regulation of motor vehicle common carriers using such highways require the regulation of private carriers by motor vehicle to the extent hereinafter provided, for which purposes, the commission is hereby vested with the authority to issue a permit to a private carrier by motor vehicle, and may attach to such permit and to the exercise of the rights and privileges granted thereunder, such terms and conditions as are reasonable.

''No application for permit, nor for any extension, or enlargement of an existing permit, shall be granted by the commission until after a hearing, nor shall any such permit, nor any extension or enlargement thereof, be granted if the commission shall be of the opinion that the proposed operation of any such private carrier will impair the efficient public service of any authorized motor vehicle common carrier or carriers then adequately serving the same territory over the same general highway route or routes.''

It will be noted that it is expressly provided, ''that the safety and welfare of the public traveling upon such highways, the preservation and maintenance of such high-

ways, and the proper regulation of motor vehicle common carriers using such highways require the regulation of private carriers by motor vehicle * * *.''

█ Primary use of the highways is the general right of every citizen, to travel thereon and transport his property in the ordinary course of life, subject to reasonable police regulation. Secondarily, the highway is used by those who conduct thereon a business for profit. The private and public use of streets and highways was distinguished in *Ex Parte Dickey*, 76 W. Va. 576, 85 S. E. 781, wherein it was said: ''The right of a citizen to travel upon the highway and transport his property thereon, in the ordinary course of life and business, differs radically and obviously from that of one who makes the highway his place of business and uses it for private gain, in the running of a stage coach or omnibus. The former is the usual and ordinary right of a citizen, a common right, a right common to all, while the latter is special, unusual, and extraordinary. As to the former, the extent of legislative power is that of regulation; but, as to the latter, its power is broader, the right may be wholly denied, or it may be permitted to some and denied to others, because of its extraordinary nature. This distinction, elementary and fundamental in character, is recognized by all the authorities.'' See, also, *Seaboard Air Line Railway Co. v. Wells*, 100 Fla. 1027, 130 So. 587.

Prior to legislative restriction the highways were freely used by all, whether for profit or not. The advent of motor vehicle transportation undoubtedly has required legislative protection for the public, who have a right to a primary use. Hence the legislative declaration that the safety and welfare of the traveling public upon the highways and the preservation and maintenance of such public highways required the regulation over private carriers. That the safety of the public on the highways is becoming a more and more serious question is evident by the ever-increasing traffic fatalities. The number of large trucks upon the public highways has become a mat-

ter of deep public concern, and until special highways are constructed solely for the purpose of truck traffic, the volume of such traffic will remain a matter of paramount importance to regulatory agencies.

In this connection we desire to call attention to the case of *Western Transportation Co. v. People,* 82 Colo. 456, 462, 261 Pac. 1, wherein we quote with approval the following language from *Buck v. Kuykendall,* 267 U. S. 307, 45 Sup. Ct. 324, 69 L. Ed. 623: " 'With the increase in number and size of the vehicles used upon a highway, both the danger and the wear and tear grow. To exclude unnecessary vehicles—particularly the large ones commonly used by carriers for hire—promotes both safety and economy. State regulation of that character is valid even as applied to interstate commerce, in the absence of legislation by Congress which deals specifically with the subject'."

To further emphasize legislative intent in regulating private carriers, we quote from section 357, chapter 16, '35 C. S. A., as follows:

"The commission is hereby vested with the power and authority and it is hereby made its express duty to prescribe such reasonable rules and regulations covering the operations of private carriers by motor vehicle as may be necessary for the effective administration of the provisions of this subdivision.

"Every private carrier is hereby forbidden, by discrimination or unfair competition, to destroy or impair the service or business of any motor vehicle common carrier or the integrity of the state's regulation of any such service or business; and to that end, the commission is hereby vested with power and authority and it is hereby made its duty to prescribe minimum rates, fares and charges to be collected by private carriers when competing with duly authorized motor vehicle common carriers, which rates, fares and charges shall not be less than the rates prescribed for motor vehicle common carriers for substantially the same or similar service."

██ ██ The legislative intent is clear, that the authorization of private carriers shall not be detrimental, within the limits of the law, to common-carrier operation. No permit as a private carrier can be granted by the commission if in its opinion, based upon proper evidence, such private-carrier operation impairs the efficient public service of an authorized common carrier serving the same territory or over the same highways or routes. All this indicates an intent to coordinate motor transportation in such a way as to preserve common-carrier operation and to not impair the integrity of state regulation of common-carrier service. That this is in the public interest cannot be questioned, especially when we have in mind the difference in legal obligations as applied to common carriers and private carriers. The obligations of a common carrier to the public are different. A common carrier has the duty of giving adequate and sustained public service at reasonable rates, without discrimination. Any failure in that respect makes it civilly liable. Liability as to loss and damage owing to negligence is of a higher degree than that of a private carrier. A private carrier is liable only for mere negligence. A common carrier is held to the highest degree of care. The purpose of the legislative intent to protect the integrity of regulatory power over common carriers is therefore apparent. The exercise of regulatory power is primarily in the public interest. A greater degree of service is required from the common carrier; hence, the legislative direction that no permit to a private carrier should be granted if it impairs the efficient public service of an authorized common carrier.

Petitioner filed an application for permit to operate as a private carrier by motor vehicle July 3, 1931, in which we find the following language: "The applicant understands and agrees that if a permit is issued to it to operate as a private carrier as prayed in this application that it is not thereby entitled to, nor will said applicant, operate as a 'motor vehicle carrier' as that term is de-

fined in Subdivision 1 (d) of Chapter 134, Session Laws 1927, as amended. The undersigned solemnly swears that the above statements are true to the best of his knowledge and belief."

Upon his application, a permit was granted which authorized him to operate over an established route, Denver to Sterling. Subsequently, and on July 6, 1935, he applied for an extension of the permit already issued, to authorize him to operate between Denver and Golden, for the purpose of transporting beer to points between Golden and Sterling. This was authorized. A paragraph substantially as quoted above also was contained in this application.

Counsel for petitioner emphasize inconsistencies between findings of the commission and those of the district court on the evidence adduced before the commission. The findings of the district court were gratuitous. It affirmed the order of the commission, and if the latter did not exceed its authority, and the evidence sustains the orders, the findings of the court are immaterial. If the commission lawfullly pursued its authority, and there was evidence upon which to base its findings and orders, that is all with which we are here concerned. A transcript of the testimony given before the commission is in the record, and we have carefully examined the same. The primary issue is whether or not petitioner conducted a motor vehicle operation as a common carrier without first obtaining a certificate of public convenience and necessity as required by law. A motor vehicle common carrier was first defined in section 1-(d), Session Laws 1927, page 500. Subsequently it was redefined in section 1-(d), Session Laws 1931, page 481. It will be noted that there are certain very important differences in the definitions, undoubtedly reflecting the experience in the regulation of motor vehicle carriers between 1927 and 1931 and the effect of private carriers on common-carrier operation. The latter section is somewhat narrower in its definition of a common carrier and omits the phrase

"who indiscriminately accept, discharge and lay down * * * freight." Indiscriminately accepting freight is undoubtedly one of the important tests in ascertaining whether or not a certain operation has the elements of a common carrier. The claim that one is a private carrier, regardless of volume, and number of shippers served, is erroneous. The latter section lays down the prima facie evidence rule in the determination of common-carrier operation, so that if any motor vehicle carrier conducts his operations (1) in whole or in part between substantially fixed points or over established routes, or (2) under contracts with more than one person or corporation, or (3) by making repeated or periodical trips, he is prima facie a motor vehicle common cerrier. That rule of evidence, however, is not conclusive; it is only presumptive and may be overcome by other evidence. Petitioner in this case admittedly operated between fixed points and over established routes, under contracts with more than one person or corporation, and made five scheduled trips per week. Did the evidence that he introduced overcome this presumption? We think not. It is not what petitioner says he does, but what he actually does, that determines his carrier status. *Davis v. People,* 79 Colo. 642, 247 Pac. 801. A private carrier is defined in 13 C. J. S., section 4, as follows: "A private carrier is one who undertakes by special agreement in a particular instance to transport property without being bound to serve every person who may apply."

The author then gives this further explanation: "A private carrier of goods has been defined as one who, without being engaged in the business of carrying as a public employment, undertakes to deliver goods in a particular case for hire or reward but this definition is not strictly correct in so far as it implies that one who does not carry for hire or reward is not a private carrier; and more accurately stated, a private carrier is one who, without making it a vocation, or holding himself out to the public as ready to act for all who desire his services,

undertakes, by special agreement in a particular instance only, to transport property from one place to another either gratuitously or for hire. He carries only for persons with whom he has an initial contract, and assumes no obligation to carry for others; and in this lies the chief distinction between a private carrier and a common carrier, * * *.''

Under the foregoing definition, each transportation by a private carrier is a "particular instance." There is no serious conflict in the evidence. Petitioner attempts to make out a case by testimony to the effect that he refused to accept certain shipments. This evidence is not convincing, and the commission was warranted in entirely disregarding it. Petitioner's theory seems to be that if a shipper agrees to be his customer and petitioner agrees to haul for the customer, regardless of volume or number of shippers, that constitutes being a private carrier. This is wholly fallacious. One of the express legislative intents in regulating private carriers was to prevent that kind of manipulation. To permit such private-carrier operation would successfully undermine all common-carrier activities. Being unable to show a public convenience and necessity, by obtaining a certificate as a common carrier, a private carrier, under the guise of such a permit, and without assuming any of the liabilities and responsibilities, would take all of the remunerative traffic from the common carrier and leave the latter to accept what remained.

It appears from the record that petitioner operates a regular scheduled service with two trucks between Sterling and Denver five times weekly. He has a freight dock at each terminal. According to his own testimony, he hauls one-third of the volume of freight transported from Denver to Sterling. He received all freight offered for carriage except in a certain isolated instance. He accepted freight on joint through rates at Denver as well as at Sterling, from private and common-carrier operators. The regulations of the commission provide that a private

carrier must list his customers. He listed these joint motor vehicle carriers as customers, claiming that they were shippers. Whether or not there were any rules or regulations prohibiting such operations at the time of the activities here under investigation we need not consider. Such operations were a violation of his permit as a private carrier and clearly constitute common-carrier operations. He issued advertising cards and distributed them to prospective customers, thereby holding himself out to the public as being engaged in the trucking business. He was not content to be a private carrier; he wanted to be a common carrier on his private-carrier permit.

We come now to a discussion of the specific grounds raised by petitioner in his application to the commission for rehearing. He contends that the findings and orders of the commission that he accepted and transported freight on joint through rates billed and destined to points on lines of various connecting carriers with whom he had interchanged freight, was unlawful, in that the commission found that this conduct on his part was in violation of present and not prior rules and regulations under which he operated. Aside from any present or prior rules and regulations, was there any law authorizing petitioner under his permit to indulge in such transportation practice? Common carriers are authorized to accept freight originating on, or destined to points on, lines of connecting carriers, and the transportation of such shipments on joint through rates or otherwise. Section 6, chapter 29, '35 C. S. A. To carry on such operations it is necessary that the carrier file tariffs with the commission showing such transportation practices. No provision in the law authorizes such joint operations by private carriers. Moreover, private carriers are prohibited from serving the general public and can only serve under special contract with the shipper in the territory authorized by his permit and not otherwise. Petitioner testified that he took any freight connecting carriers

offered, and the connecting carriers took any freight he offered. That practice applied to private as well as to common carriers. The originating carrier made the freight rate. The delivering carrier (petitioner in this instance), never saw the shipper, nor did he make any special contract with the shipper. He received his pro rata share of the freight charges from the originating carrier. The important question with which we are here concerned is, did this practice constitute unauthorized common-carrier operation? To answer in the negative would give a private carrier the right to transport on joint through rates, freight to any point in the state. This obviously was not granted him by his permit. Such practices have been declared unlawful, and we know of no decisions to the contrary. See *Coast Truck Line, Inc. v. Railroad Commission*, 191 Cal. 257, 215 Pac. 898; *Pennsylvania Railroad Co. v. Public Utilities Commission*, 116 O. St. 80, 155 N. E. 694; *Railroad Commission of Texas v. Red Arrow Freight Lines* (Tex.), 96 S. W. (2d) 735; *Russell v. Calhoun*, 51 Wyo. 448, 68 P. (2d) 591.

Having in mind that the legislative intent is to protect common-carrier service, we can reach no other conclusion than that the finding of the commission was lawful and proper.

It next is contended that no rule was adopted until September 1, 1936, prohibiting the practice of joint through traffic between different private and common-carrier operations and the extension of a route authorized by the permit by linking two or more duties operated under private permits or under private permits and certificates of public convenience and necessity, and that the practice petitioner had followed prior to that time was commonly engaged in by other private carriers, and that, therefore, the findings and order of the commission were unlawful.

The rule to which reference is made was not introduced in evidence and does not appear in the record. That this practice had been condoned or tacitly approved by the

commission is immaterial. No power exists in a commission or commissioners or employees to approve any unlawful operation. The rule undoubtedly was adopted to more fully advise motor vehicle carriers as to unlawful operations. Our concern is, was it or was it not lawful. To say that a commission is forever bound by a mistaken understanding of the law or by an error in judgment, would undermine all regulatory power, which, as applied to motor vehicle carriers, is still in its infancy. It is a general principle of law that the doctrine of estoppel cannot be invoked against any governmental agency, acting in its public capacity. 21 C. J. 1186, 1187, 1191. *Magruder v. City of Redwood,* 203 Cal. 665, 265 Pac. 807; *Huron Portland Cement Co. v. Woodworth,* 19 F. (2d) 530; *Ohio Electric Power Co. v. State,* 121 O. St. 235, 167 N. E. 877.

In *Baldwin v. State Corporation Commission,* 143 Kan. 580, 56 P. (2d) 453, the Supreme Court of Kansas, in discussing a joint operation between a private motor carrier and a rail common carrier, had this to say: "It clearly appears one of the main purposes of the act is to protect common carriers by rail and common carriers by motor vehicle alike in territory where there exists sufficient common-carrier service to adequately meet the public needs. To permit respondent in its service as a common carrier by rail to add a short-cut motor service over a direct line already served by rail and motor carriers, without obtaining a certificate to do so, would of course defeat the obvious intent and purpose of the act. The evidence plainly discloses the service of the contract carrier, Blake, is a part of the common-carrier service conducted by respondent."

See, also, *United States v. Brooklyn Eastern District Terminal,* 249 U. S. 296, 39 Sup. Ct. 283, 63 L. Ed. 613. We are cited to an administrative ruling of the Interstate Commerce Commission, pertinent here, which reads in part as follows: "Q. May a contract carrier interchange interstate shipments with common carriers? A. If in-

terstate shipments are interchanged with common carriers, the transportation is a common-carrier service and not a contract-carrier service; and a contract carrier may not engage in such interchange without changing his status to that of a common carrier.''

It next is contended by plaintiff in error that the findings of the commission are unlawful in holding that respondent cannot list, under the rules of the commission in effect prior to the filing of the complaint or in effect at the time of the hearing before the commission, as consignee or consignor customers, the names of connecting carriers under private or common-carrier permits; and counsel cite, to sustain this contention, *Burbridge v. Public Utilities Com.*, 91 Colo. 134, 12 P. (2d) 1115. In that case we were concerned solely with the definition of common carriers as set out in chapter 134, Session Laws, 1927. We already have called attention to the statutory change in the law in 1935, expressly declaring a legislative intent to protect motor vehicle common carriers. Burbridge claimed to be operating as a private carrier. No regulatory power existed at that time over his transportation system; nor do we find anything in that case that passes upon the authority of a private carrier to transport for a connecting private or common carrier. The case, therefore, is not in point.

We next direct our attention to the advertising cards of petitioner, which he admits distributing to his customers. This card reads as follows:

"Private                                                            Permit
Carrier                                                            No. A-44

McKay Truck Line
Service to Customers
Fully Insured.
Denver Headquarters 2252 Lawrence St.,
Phone Tabor 1680

"Service Denver to Sterling daily except Saturday Connecting with the following lines:

"Broendel Truck Line at Sterling, running for customer service daily except Monday to Iliff, Proctor, Sedgwick, Ovid, and Julesburg. Thursday, to Big Springs, Chappell and Ogallala, Nebraska.

"Windsheimer Truck Line running from Sterling to Peets, Colorado, Sidney, Dalton, Gurley, Bridgeport, Minatare, Bayard, Scottsbluff and Gering, Nebraska.

"Brooks Truck Line running from Sterling to North Platte, Grand Island, Omaha and Intermediate points, Sterling phone 85-W, Omaha Headquarters, 812 Howard St., phone Jackson 2646."

"Sterling Headquarters, McKay Truck Line, at Anderson Storage, Phone 38

"Call or see us for rates on long distance hauling. Enclosed dust proof bodies on all lines."

The contention is made that petitioner talked to a commissioner or inspector, who, it is alleged, had approved the same. We cannot too strongly stress that this is no defense to a charge for the violation of any law or order of the commission or the terms of a permit. We are not concerned with the wisdom or lack of wisdom of those connected with the administration of regulatory power to give curbstone opinions as to what may and may not be done. The law provides how the commission shall determine an issue, and mere conversations are impotent to change it. 51 C. J. 62, §116. That petitioner, in distributing his advertising cards, held himself out as being in a position to carry freight indiscriminately over the connecting lines listed as private as well as common carriers cannot be questioned. His protestations in that regard carry very little weight. Whatever the rules or their effective date may have been in connection with advertising by private carriers, it was unlawful for petitioner to hold himself out to the public as authorized to transport indiscriminately as a common carrier without first having obtained a certificate of public convenience and necessity therefor. The commission undoubtedly did

not take seriously petitioner's testimony that he only delivered these cards to his customers. The invitation on the card speaks for itself. If petitioner had no authority to operate as a common carrier—and that in effect is the finding of the commission—then he had no right to advertise such service. The commission was warranted, under the evidence, to declare this advertising unlawful.

Our attention next is called to the finding of the commission that petitioner improperly operated as a common carrier in interstate commerce and as a private carrier in intrastate commerce, over the same route, at the same time, with the same equipment and under the same trade name. The evidence to sustain that finding is conclusive. It is asserted that the commission had no jurisdiction to make such a finding, since it was without jurisdiction to regulate motor vehicle carriers in interstate commerce. In this finding the commission was not assuming to regulate interstate commerce transportation. It was simply attempting to police intrastate operations. Petitioner testified that he transported freight in interstate commerce through connecting carriers. There is no dispute on this point. The main issue before the commission called for a determination of petitioner's status in intrastate commerce, and his interstate operation was only one incident, among others, in a chain of facts established at the hearing, as proving that he was operating in intrastate commerce as a motor vehicle common carrier and not as a private carrier. That a motor vehicle carrier cannot at the same time be both a private carrier and a common carrier is now generally conceded. One cannot devote his property to a public use by utilizing one part of a truck for common-carrier service and another part of the same truck for private-carrier service. Such a holding would make regulatory power ridiculous. The leading case on this subject is *York Motor Express v. Public Service Commission,* 96 Pa. Superior Ct. 174. While the issue in that case related solely to

intrastate service, the principle announced is the same. See, also, *Hubert v. Public Service Commission*, 118 Pa. Superior Ct. 128, 180 Atl. 23; *Vance Transportation Co. v. Public Service Commission*, 105 Pa. Superior Ct. 228, 161 Atl. 428; *Baldwin v. State Corporation Commission*, *supra*. To sustain his contention that the order of the commission in this respect is unlawful, petitioner cites *Burbridge v. Public Utilities Com.*, *supra*, and *McDill v. Motor Freight*, 92 Colo. 198, 19 P. (2d) 204. We have heretofore commented on the Burbridge case. The McDill case did not involve a review of a commission order. It was a suit by a common carrier to enjoin the unlawful operations of a private carrier. The trial court found that the latter was operating as a common carrier. That case also was decided prior to the passage of statutory enactments specifically indicating legislative intent in the application of regulatory power over private carriers. No questions of interstate shipments were involved in either case, and under the facts here presented, they are not in point.

The main issue determined by the commission was whether or not petitioner was transporting intrastate shipments of freight as a motor vehicle common carrier, without lawful authority. Its determination that he was, is amply supported by the law and the evidence. The factual experience in motor vehicle operations gives life "to the dead words of a statute," providing for regulatory power over such transportation operations. At least three-fourths of the value of the law lies in its effective administration. That is the necessary transfusion to give it life.

Counsel for petitioner, in their brief, refer to the authority conferred by his permit to serve intermediate points between Denver and Sterling. The commission decided that he has such authority. Subsequently it granted a rehearing on that issue. Under the circumstances, we do not pass upon this question. The trial

424

court was correct in affirming the findings and orders of the commission.

The judgment is affirmed.

Mr. Justice Francis E. Bouck and Mr. Justice Bakke not participating.