No. 20,681.

THE PEOPLE OF THE STATE OF COLORADO *v.*
ROBERT L. QUIMBY AND ADOLPH DIEMOZ.
(381 P. [2d] 275)

Decided May 6, 1963.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK
E. HICKEY, Deputy, Mr. THOMAS A. NELSON, JR., Assist-
ant, for plaintiff.

Mr. ROBERT DELANEY, Mr. CHARLES F. STEWART, for defendant Robert L. Quimby.

Messrs. PETRE & ZIMMERMAN, for defendant Adolph Diemoz.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

THIS is an original proceeding brought pursuant to Rule 116, R.C.P. Colo., involving a question of great public importance, to-wit: Which of the two defendants is lawfully entitled to hold the office of county commissioner in District No. 1, in Garfield County, Colorado. The facts are stipulated.

The late Freeman S. James entered upon the office of county commissioner on January 13, 1959, the term of said office to expire on January 8, 1963. On November 6, 1962, James was re-elected as county commissioner for the new term beginning January 8, 1963. Nine days after the election he died.

To the vacancy thus created the defendant Robert L. Quimby was appointed by the then Governor of Colorado, Hon. Stephen L. R. McNichols, his appointment stating: " * * * to hold office as by statute provided, to-wit: until the next general election and until his successor elected thereat shall be duly qualified * * * ." Commissioner Quimby took office pursuant to said appointment on the 21st day of November, 1962, and claims to be entitled to continue therein until after the general election in 1964, when whomsoever is elected "thereat" qualifies.

Believing that a vacancy existed in the commissioner's office at the expiration of the term of Commissioner James on January 8, 1963, the present Governor of the State of Colorado, Hon. John A. Love, on January 29, 1963, appointed defendant Diemoz to the office. Defend-

ant Diemoz having taken his oath of office, assumed to take over the same, but defendant Quimby has refused to recognize the vacancy or the appointment.

The question is thus presented as to whether Quimby, by virtue of his appointment in November of 1962, or Diemoz, by virtue of his appointment on January 29, 1963, is rightfully entitled to the position of commissioner of Garfield County.

Several sections of the Colorado Constitution and several of the state statutes are involved. Article XIV, section 9, reads:

"Vacancies — how filled. — In case of a vacancy occurring in the office of county commissioner, the governor shall fill the same by appointment; and in case of a vacancy in any other county office, or in any precinct office, the board of county commissioners shall fill the same by appointment; and the person appointed shall hold the office until the next general election, or until the vacancy be filled by election according to law."

Article XII, section 10 of the Constitution, provides:

"Refusal to qualify — vacancy — If any person elected or appointed to any office shall refuse or neglect to qualify therein within the time prescribed by law, such office shall be deemed vacant."

C.R.S. '53, 35-3-9, is merely a re-statement by the Legislature of Article XIV, section 9 of the Constitution. Considering Article XIV, section 9 of the Constitution alone, it would seem that there is no ambiguity and that the answer is readily apparent. Nevertheless, this court in 1909, faced with a similar problem involving the appointment of a county officer, a sheriff, rather than a county commissioner, but nevertheless being confronted with the same article of the constitution, held that it was not capable of interpretation without also taking into consideration Article XII, section 10. Considering the one relevant to the other, the court in *People ex rel. Callaway v. De Guelle*, 47 Colo. 13, 105 Pac. 1110, held that a new vacancy exists when the one

term expires and the new term of office begins. The court said:

"It is clear to our minds that a person elected or appointed to fill a vacancy in an unexpired term of a public office, such as sheriff, holds precisely as his predecessor would have held had he continued in office, and in no other way; and has the same rights, and none other, that such predecessor would have had.

\* \* \*

"Considering together the several constitutional provisions involved, and giving to each the meaning which the language necessarily implies, it is clear that when a person is elected to a term, under the constitution, a contingent or inchoate right to the office is vested in him, which becomes absolute upon his qualification. He is elected to the term and no one else can enter therein until he is ousted therefrom, which can never be until the commencement of the term. When he does not qualify, the contingent right is gone. There is no one legally entitled to the term, and when the date of the term arrives there is a vacancy under the constitution, though there be some one actually and legally performing the duties of the office.

"The law that created the office established the right to hold the office by terms of two years each. — §848, Mills' Ann. Stats. It, in effect, divided the future into periods of two years, and designated each period a term. When the law created the term, and fixed the commencement and ending of each term, it provided for the filling of each term by a biennial election, but does not permit the person chosen to assume the duties of the office until he files a bond and oath of office, which must be done before the commencement of the term, or 'the office shall be deemed vacant.' — §10, art. XII, Colo. Const.

" 'Vacancy applies not to the incumbent, but to the term, or to the office, or both, whether to the term, or to the office, or both, depending generally upon the

context,' is the doctrine declared in People ex rel. v. Le Fevre, 21 Colo. 218, 230.

\* \* \*

"We have no hesitancy in declaring that an appointee to fill a vacancy under our law holds until the next general election, if no new term intervenes between the time of his appointment and the time of such election, but if a new term commences during the interval, the term of the appointee ends and the one entitled to the new term has a right thereto, but if such one on the arrival of the term does not appear and qualify, though the reason thereof be death, there is a vacancy in the office for the term; that until an appointment is made, the incumbent of the previous term holds over, but when an appointment is made, and the appointee qualifies, the previous term, and the rights of the incumbent to the office, are ended."

██ The doctrine of "stare decisis" should be adhered to in the absence of sound reason for rejecting it. If a decision is palpably wrong or great social changes have been wrought so as to make the prior decision repugnant to rather than in aid of the constitution, a court may be justified in overruling prior interpretation of the constitution. No such compelling reasons present themselves here. The prior decisions give full credence to a rule of construction that requires two sections to be construed, if possible, so that both may stand and effect may be given to each. As recently as November 20, 1961, in a case not similar in facts but on an occasion when this court determined to re-state the doctrine of "stare decisis," Chief Justice Hall, writing for the court, in *Creacy v. Industrial Commission,* 148 Colo. 429, 366 P. (2d) 384, commented:

" \* \* \* Under the doctrine of stare decisis courts are very reluctant to undo settled law. This doctrine has for its object, uniformity, certainty, and stability of the law and the rights acquired thereunder. The rule of stare decisis is not a doctrine of mortmain; it does not

exclude room for growth in the law and the courts are not without power to depart from a prior ruling, or to overrule it, where sound reasons exist and where the general interests will suffer less by such departure than from a strict adherence."

In the same case the language of Mr. Chief Justice Burke, speaking in *Wolf v. People,* 117 Colo. 279, 187 P. (2d) 926, was adopted:

" * * * the question would thus seem to be definitely and finally disposed of in this jurisdiction under the rule of stare decises (sic). We are not unconscious of the fact that that rule is frequently ignored, with the general approval of the courts, for certain definite and often valid reasons. Among these are doubtful decisions handed down by closely divided courts and recent decisions establishing rules not yet firmly embedded in the jurisprudence of the jurisdiction. No such reason can possibly exist here. The best reason, and the one perhaps most frequently invoked to justify a departure from the rule, is that the case under consideration by the court demonstrates that adherence thereto will either promote injustice or defeat justice. No such reason exists in the instant case for any present change in the rule * * * ."

■ There is considerable authority contrary to the Colorado view in other jurisdictions (see 74 A.L.R. 486) with the Colorado view being classified as that of the minority. If we were confronted with this question for the first time, or even for the first time since 1909, there might be some justification for following the majority rule. However, ten years after the De Guelle decision, the court had an opportunity to re-examine its position and interpretation in *Gibbs v. People,* 66 Colo. 414, 182 Pac. 894 (1919). There the court, expressly affirming the De Guelle case, stated in reference to the latter that:

" * * * we there held unqualifiedly that under such provision a vacancy occurs, whether the failure to qualify comes through wilful neglect or refusal, or through impossibility because of death. And we also there held,

which question was likewise then necessarily before us for decision, that the word 'vacancy' relates to term of office as well as to the office itself, either or both, according to the facts of the particular case.

"In strict conformity with the conclusion in the De Guelle case, and upon general principles and authority, we hold that, under the undisputed facts, there was a vacancy in the term of office of the County Clerk and Recorder of Delta County at the time the Commissioners appointed Watts. That his appointment was in all respects regular and proper, and that he having duly qualified, is entitled to the office.  * * * "

Accordingly, we hold that the law in the situation presented is controlled by Article XIV, section 9, and Article XII, section 10 of the state constitution, which this court has previously held must be read and construed together.

It follows that Adolph Diemoz is the rightful holder of the office of County Commissioner of District No. 1 of Garfield County, Colorado, pursuant to his appointment by the Governor to fill the vacancy existing in the office for the term beginning January 8, 1963. Judgment will enter accordingly.

Mr. Chief Justice Frantz dissents.

Mr. Justice Sutton not participating.

Mr. Chief Justice Frantz dissenting:

*People ex rel. Callaway v. De Guelle,* 47 Colo. 13, 105 Pac. 1110 — doctrinally approved in *Gibbs v. People,* 66 Colo. 414, 182 Pac. 895 — constitutes an amendment of Article XIV, Section 9 of the Constitution of this state by judicial act, and hence should be accepted for what it is: a usurpation by the judiciary of a power solely and wholly reserved in the people. I, therefore, respectfully but vigorously refuse to follow a precedent which, after study, should be gracefully acknowledged by us

to have been a judicial mistake, and therefore to have attained no greater stature than being res adjudicata of the particular case it purported to decide.

It is the solemn duty of this Court to maintain the Constitution of this state, not to maintain this Court's mistake in the interpretation of the organic law. An amendment of a constitutional provision resulting from a decision of this Court is an unconstitutional act, *Straughan v. Coeur D'Alene,* 53 Ida. 494, 24 P. (2d) 321, and an unconstitutional act does not through some mystic process become constitutional by repetition. Our oath, required by Article XII, Sections 8 and 9, exacts of us that we support the Constitution, not alter it; and it seems to me that it is our duty to close a judicially created breach in it at our earliest opportunity.

Article XIV, Section 9, of the Constitution is so direct, plain and complete in itself that it admits of no interpretation, other than to recognize its self-revealing meaning. In content it is so self-sufficient that it is manifestly a self-executing constitutional mandate. Specifically directing what shall be done when vacancies occur in county offices, it is a special constitutional provision dealing with such vacancies, unaffected by general provisions relating to vacancies.

A reading and consideration of the section justifies each of the foregoing propositions. I quote the section:

"In case of a vacancy occurring in the office of county commissioner, the governor shall fill the same by appointment; and in case of a vacancy in any other county office, or in any precinct office, the board of county commissioners shall fill the same by appointment; and the person appointed shall hold the office until the next general election, *or* until the vacancy be filled by election according to law." (Emphasis supplied.)

In the instant case the then Governor appointed Quimby to fill the vacancy, and Quimby should have held his office *"until* the next general *election,* or until the vacancy be filled by *election* according to law." His

continuation in office depended upon *elections;* termination of his tenure of the office could result only from *elections.* See *People v. Rucker,* 5 Colo. 455. The Court in *People v. De Guelle,* supra, judicially amended the provision by adding to elections to bring about termination of office the alternative of an appointment. It in effect held that a county commissioner appointed to fill a vacancy would hold his office "until an appointment" of another under certain circumstances.

I contend that a constitutional direction that "[i]n case of a vacancy occurring in the office of county commissioner, the governor shall fill the same by appointment; * * * and the person so appointed shall hold the office *until* the next general election, *or until* the vacancy be filled by election according to law," is the quintessence of simplicity, certainty and completeness; it has a face value. Being so constituted, there is nothing to interpret except to realize its plain and express meaning.

It is not the function of courts to interpret that which needs no interpretation; plain, meaningful language setting forth a complete constitutional instruction should be accepted at its face value, and we have so held. Language of a constitutional provision which is plain and has a clear meaning leaves "nothing to interpret. We must enforce it as written." *Koenig v. Jewish Society,* 98 Colo. 253, 55 P. (2d) 325. Construction of a constitutional provision "can never fritter away its obvious sense." *Berman v. Denver,* 120 Colo. 218, 209 P. (2d) 754.

Article XIV, Section 9, is self-sufficient and therefore self-executing. If this court only had heeded its earlier pronouncement, *People v. De Guelle* would not be cited to our embarrassment in this case. In 1899 it was the opinion of the Court, *Frost v. Pfeiffer,* 26 Colo. 338, 58 Pac. 147, that:

"Section 9, art. 14, of the Constitution empowers the governor to make designated appointments in case of

vacancies, which appointees, in turn, are authorized to fill all others in county and precinct offices, — *a provision which is self-executing,* and can be resorted to independent of any in the act on the subject." (Emphasis supplied.)

By holding that it was self-executing, the Court regarded the provision as "complete in itself." *People v. Pitcher,* 61 Colo. 149, 156 Pac. 812. "[I]f a constitutional provision is complete in itself, it executes itself." *Town of Lyons v. City of Longmont,* 54 Colo. 112, 129 Pac. 198.

It necessarily follows that if Article XIV, Section 9, is complete in itself, it executes itself; and, it being so constituted, we should then hold that there is no need to resort to other constitutional provisions to make it effective. And I believe this Court was correct beyond cavil in holding in 1899 that Article XIV, Section 9, was complete in itself and self-executing, and this Court was wrong beyond cavil in holding ten years later in the De Guelle case that the provision was so lacking in completeness that resort had to be had to other constitutional provisions to ascertain the rightful holder of an office.

A section of the Constitution dealing specifically with vacancies in certain offices controls, and a constitutional provision of general application on the subject of vacancies has no application. Article XII (which was injected in the De Guelle case to change the plain, specific and self-sufficient language of Article XIV, Section 9) is a general provision dealing with officers "holding any civil office under the state or any municipality therein" (Section 1), and providing for vacancies "to any office" (Section 10), and for the termination of the "term of office of any officer elected to fill a vacancy . . ." (Section 11). Civil service is a part of this Article XII.

In *People v. Field,* 66 Colo. 367, 181 Pac. 526, title to the office of a member of the board of land commissioners of Colorado was at stake. Was Article IX, Section 9, creating a board of land commissioners and providing

for their appointment, the controlling constitutional provision or was Article XII, and particularly the Civil Service section, the governing provision?

This Court, in holding the section having to do with the formation and staffing of the board to be applicable, said:

" * * * If these two alleged conflicting provisions had been contained in the Constitution as originally adopted, the one dealing with a special and particular subject, the other general, and dealing with employees generally, can it be said that the special provision was not in the minds of the framers when drafting the general provision? Yet this furnishes the test to be applied in this case. The rule is well-settled that, where there is a conflict between a general and a special provision of the Constitution, the special controls that which it was intended to control."

I earnestly urge that the special provision having to do with county officers prevails over the general provision which applies to any office or officers of the state or municipality.

No matter how we approach a consideration of Article XIV, Section 9 — whether from the standpoint of its plain, simple, complete and obvious meaning, or its wholeness by which it is self-executing, or its special character as overriding a general provision — we should consider the De Guelle decision a closed and to-be-forgotten chapter in the judicial effort to support the State Constitution.

That an interpretation of the Constitution by the Supreme Court becomes "stare decisis," as proposed by the majority, is not sound constitutional law. Stare decisis in its true sense applies to decisions involving the common law. A precedent regarding the interpretation of the Constitution is, and should be, considered differently. *Mountain Grove Bank v. Douglas County*, 146 Mo. 42, 47 S.W. 944. "[N]o set of judges ought to

have the right to tie the hands of their successors on constitutional questions . . . " Idem.

To say that a mistake in the interpretation of the Constitution by the Supreme Court may undo the voice of the people as expressed in their Constitution, and that it will take a vote of the people to undo the judicial mistake is iniquitous doctrine, wholly out of keeping with a government operating under a Constitution in which the mandate of the people may not be set at naught by an errant court. See *Straughan v. Coeur D'Alene,* supra; *Stoliker v. Waite,* 359 Mich. 65, 101 N.W. (2d) 299.

Not only is the majority decision in conflict with the weight of authority, but it overrules the position of this Court on the matter. In yielding to precedent, which I believe I have shown to be ill-founded, they overthrow precedent in a more sensitive area.

The Supreme Court is not the body to make a change in the Constitution; it was not at the time of the De Guelle case, and it is not now. Amendments to the Constitution are products of the people of this state, and this Court has no authority to arrogate to itself the power to amend, by mistake or otherwise, or to keep alive such judicially created amendment.

Article II of the Constitution ordains:

"In order to assert our rights, acknowledge our duties, and proclaim the principles upon which our government is founded, we declare:

"Section 1. Vestment of political power. — All political power is vested in and derived from the people; all government, of right, originates from the people, *is founded upon their will only;* and is instituted for the good of the whole.

"Section 2. People may alter or abolish form of government — proviso. — *The People of this state have the sole and exclusive right* of governing themselves, as a free, sovereign and independent state; and *to alter* and

abolish *their Constitution* and form of government. . . ."
(Emphasis supplied.)

Article V, Section 1, and Article XIX, Sections 1 and 2, set up machinery whereby the people may amend the Constitution. When acting under these provisions, the amending power is the exercise of the sovereign power of the people. See *Golden v. People,* 101 Colo. 381, 74 P. (2d) 715.

What power did the people repose in the judicial department of the state? "The *judicial power* of the state as to all matters of law and equity, except as in the Constitution otherwise provided, shall be vested in the supreme court, district courts, county courts, and such other courts as may be provided by law. * * * " Article VI, Section 1. One will search the organic law in vain to find even an implied power in the judiciary to amend it.

To look beyond Article XIV, Section 9, for a different meaning than therein expressed "would be to ignore the plain language [of the section] and by judicial construction frame and adopt a constitutional provision for the people instead of construing the one they adopted. Our functions are judicial, not legislative. When a constitutional provision is expressed in unambiguous terms, when the sense is manifest, there can be no reason not to adopt the sense which it naturally presents." *People v. Denver,* 60 Colo. 370, 153 Pac. 690.

In the year 1905 the opinion in *People ex rel v. Johnson,* 34 Colo. 143, 86 Pac. 233, was released. By that decision the effect of Article XX of the Constitution was greatly limited. This Court determined the case upon the broad proposition that the people of the whole state could not amend their Constitution so as to empower the people of the City and County of Denver, by charter, to designate the agencies, other than those already provided by the Constitution and laws, to discharge, within the city and county, governmental duties relating to state and county affairs. The doctrine was

confirmed in the case of *People ex rel. v. Horan,* 34 Colo. 304, 86 Pac. 252.

Two decisions construing the Constitution had become part of the literature of the law of this state. The Johnson and Horan decisions were challenged in the case of *People ex rel. v. Cassiday,* 50 Colo. 503, 117 Pac. 357. Parenthetically, it should be noted that the De Guelle and Gibbs decisions are challenged in this case.

What did this Court do in the Cassiday case? It used language which has such pertinency to the present case that I quote from it generously. In dealing with the problem, this Court, as presently constituted, could have been as forthright as was the Court in the Cassiday case.

The Court observed:

"The language of section 2, which rendered it possible and proper to then declare the whole article valid, was in effect eliminated from the article by the majority opinion in the Johnson case. What is the meaning of the language, 'Every charter shall designate the officers who shall, respectively, perform the acts and duties required of county officers to be done by the constitution, or the general law, as far as applicable,' if it does not mean just what it says? It must mean that, or it means nothing. *The language is plain and positive; it is without a trace of ambiguity. It is a part of the Constitution. It is so plain that construction is unnecessary.* What is to be done with the provision? In the Johnson case, it is utterly ignored and disregarded. * * * No law has been cited, and we confidently assert that none can be found, which shows that it is not competent for a fixed governmental duty to be performed by an agent designated for that purpose by a local subdivision of the state. *The meaning of this provision is clear, its terms are unambiguous, the mandate is positive. Something must be done with it. It should be given effect according to its meaning.* By the decision in the Johnson case, this provision was set aside and held to be empty and meaningless." (Emphasis supplied.)

Does not the following language from the opinion have application to the instant case?

" * * * The constitution may be read from one end to the other, and there is not a clause in it more certain in its meaning than the words used in imposing the duty upon the people of the city and county of Denver, after creating its own local officers, to designate those who shall perform the acts and duties required of county officers to be done by the constitution and general laws. Essentially, the whole case rests upon the meaning of this provision and its enforcement. If section 2 does not delegate the power to the city and county of Denver in its charter, to designate agencies to perform these admitted governmental duties, then the conclusion in the Johnson case is right. On the other hand, if such power is delegated by section 2 and *if this constitutional provision is to be enforced according to its plain meaning, the conclusion in the Johnson case is wrong."* (Emphasis supplied.)

The following quotation could be used with equal propriety in the instant case:

" * * * The opinion [in the Johnson case] ignores the fact that special and general provisions of the constitution stand together. Neither destroys the other. The special controls that which it was intended to control, and to that extent displaces the general, while the general controls in all cases where the special provision does not apply."

We should heed this language:

" * * * The *only power* which the supreme court has to interfere with the sovereign will of the people is when there is a violation of the federal compact. If the constitution makers had used doubtful or uncertain language, it is the province of the court to say what it really means by such doubtful or uncertain language, but it is neither the duty nor province of this court to substitute any other language for that used by the constitution makers, nor to place any forced construction

upon such language nor to eliminate any language from the organic law of the people. The [Johnson] decision must therefore mean, in view of the plain provisions of section 2 of Article XX, that the action authorized thereby is subversive of a republican form of government, and to this conclusion *the court, as now constituted,* is unable to assent." (Emphasis supplied.)

I respectfully urge that we do what that court did:

" * * * For the present, at least, it is entirely sufficient to know and declare that the plain duty now confronts us of giving force to a clear and positive constitutional mandate, according to its undoubted meaning, in conformity with the intent and purpose of the whole people of the State, as thereby expressed, to the effect that there shall be in the city and county of Denver a consolidated government in fact, and that one set of officers shall discharge double duties therein, at one and the same time, including those which pertain to matters purely local, as well as those which have to do with governmental affairs of state and county.

"We conclude, therefore, that the reasoning in the Johnson case ought not to stand. The judgment there entered is the law of the case; it remains undisturbed and is binding upon the parties thereto."

The 20th Amendment was again involved in *People v. Mountain States Tel. & Tel. Co.,* 125 Colo. 167, 243 P. (2d) 397 (1952). Since 1919 the decision in the earlier case of *Denver v. Mountain States Tel. & Tel Co.,* 67 Colo. 225, 184 Pac. 604, has been accepted by this Court as stating the law. *Pueblo v. Public Utilities Comm.,* 68 Colo. 155, 187 Pac. 1026; *Atchison T. & S. F. Ry. Co. v. Public Utilities Comm.,* 68 Colo. 92, 188 Pac. 747; *Fort Collins v. Public Utilities Comm.,* 69 Colo. 554, 195 Pac. 1099; *Holyoke v. Smith,* 75 Colo. 286, 226 Pac. 158; *Spears v. Public Utilities Comm.,* 100 Colo. 269, 67 P. (2d) 1029; *McKay v. Public Utilities Comm.,* 104 Colo. 402, 91 P. (2d) 965; and *Berman v. Denver,* supra. Notwithstanding a series of cases accepting a construction of

the 20th Amendment, this Court had no difficulty and little hesitancy in saying in 1952:

"First and foremost we expressly overrule our decision in Denver v. Telegraph Co., supra, because at the time it was decided the rule announced was without adequate support in the law."

The Cassiday and 1952 Mountain States Tel. & Tel. Co. cases are in harmony with a republican form of government. "[T]he integrity of the Constitution is of supreme importance in every free government, and every departure therefrom should be closely scrutinized and rigidly restrained. It cannot be tolerated that those whose duty it is to support the Constitution may subvert it by a construction, inadvertent or deliberately formed, which shall be forever after binding upon their successors and the people." *State ex rel. v. Lewis,* 69 Oh. St. 202, 69 N.E. 132.

In *Higgins v. Bordages,* 88 Tex. 458, 31 S.W. 52, the Supreme Court asked the pointed question, "Shall we uphold the constitution as it was made by the sovereign power of the state of Texas, or shall we uphold a decision of the supreme court, itself a creature of the constitution?"

In answering, it found the former decision violative of the express provisions of the Constitution of Texas, and said:

" * * * To follow it means to disregard the constitution, as we understand its provisions, and in our judgment would deprive citizens of a constitutional protection, provided by a convention representing the sovereign power of the state, which had the right to determine the policy of this state with regard to this question."

One further quotation, taken from *Carter-Jones Lbr. Co. v. Eblen,* 167 Oh. St. 189, 147 N.E. (2d) 486, 68 A.L.R. (2d) 285:

" 'No amount of wrong adjudication can justify a practical abrogation of the constitution. We may pause

and consider carefully when we find our views to be in conflict with those entertained by our predecessors; but, if it be found that the conflict is honestly irreconcilable, there is but one course to take, and that is to follow our own convictions.' "

For me, the choice between precedents is not difficult to make. We must determine whether we shall follow a precedent of this Court construing a constitutional provision in such manner as to be violative of it, or follow the Cassiday and the 1952 Mountain States Tel. & Tel. Co. cases and hold that such construction, thwarting the will of the people as expressed in the Constitution, shall not be perpetuated. If stare decisis is applicable, I would yield to it in undoing a judicial act which contravenes the constitution; the alternative is wholly unacceptable to me.

On May 1st this country celebrated Law Day U.S.A., a day on which we pay homage to a system of government under law rather than a government under men. I fear that this concept of a government under law becomes only a semblance in this case. In lieu of the Constitution controlling, the Court, the mere creature of the Constitution, assumes ascendancy. This should not happen in respect to any article of the Constitution, regardless of any view that may be entertained concerning its importance.